**Henry H. CLAUSSEN, Plaintiff,**

v.

**The AETNA CASUALTY & SURETY COMPANY, First Defendant,**

and

**Federal Insurance Company, Second Defendant, et al.**

**No. CV185–248.**

United States District Court,
S.D. Georgia, Augusta Division.

Dec. 7, 1987.

David E. Hudson, Augusta, Ga., for plaintiff.

James A. Eichelberger, Neely & Player, Atlanta, Ga., Robert L. Allgood, Allgood & Childs, A. Montague Miller, Thomas Tucker, Dye, Miller, Tucker & Everitt, Augusta, Ga., Thomas E. McCarter, David A. Handley, Smith, Gambrell & Russell, Atlanta, Ga., Wiley S. Obenshain, III, Fulcher, Hagler, Reed, Obenshain, Hanks & Harper, Augusta, Ga., James B. Hiers, Jr., Donald F. Daugherty, Swift, Currie, McGhee & Hiers, Robert L. Todd, C. Michael Johnson, Atlanta, Ga., William Byrd Warlick, Augusta, Ga., for defendants.

ORDER

EDENFIELD, District Judge.

A number of motions are presently before the Court. Third party defendant Highlands Insurance Company (Highlands) has filed a motion for summary judgment. Defendants Aetna Casualty & Surety Co. (Aetna), Harbor Insurance Co. (Harbor), and American Home Assurance Co. (American Home) have moved for entry of final judgment. Plaintiff has moved for an Extension of Discovery Time and for Reconsideration of Order Granting Aetna's Motion to Quash Subpoena.

I. *Background*

In one way or another, all of the motions pending in this case relate to the Court's construction of the "pollution exclusion clause." The pollution exclusion clause is a standard provision in general comprehensive liability policies, and has been since 1970. The clause denies coverage for pollution-related bodily injury or property damage. It contains an exception which states that the pollution exclusion does not apply where a release, dispersal, or escape of pollutants is "sudden and accidental."

Plaintiff, Henry H. Claussen, brought this action to obtain a declaration that he is covered under various insurance policies for pollution-related liability incurred as a result of the gradual release, over a period of years, of hazardous wastes from land owned by him [1] near Jacksonville, Florida. Plaintiff's land, known as the Picketville landfill (Picketville), has been used by the City of Jacksonville, pursuant to a contract, for the disposal of wastes.

By Order dated August 11, 1987,[2] summary judgment was granted in favor of Aetna, American Home, and Harbor on the ground that liability incurred as a result of the release of hazardous wastes from Picketville fell within the pollution exclusion and, because the hazardous wastes were released gradually over a period of years, did not fall within the exception to the pollution exclusion for *"sudden* and accidental" releases.

Before the pollution exclusion was inserted into insurance policies, coverage of pollution-related liability depended on whether the pollution giving rise to liability fell within the definition of "occurrence." Liability arising from "occurrences" was covered and included "unintended and unexpected" pollution; intentional and expected pollution was not covered. *See generally,* Note, *The Pollution Exclusion Through the Looking Glass,* 74 Geo.L.J. 1237, 1246–51 (1986). Courts generally held that pollution-related damage occurring gradually over the years could constitute an occurrence as long as the damage was unintended and unexpected. *Id.*

The pollution-exclusion clause, as construed by the Court in its Order of August 11, worked a sharp change in coverage for pollution-related liability. By excluding coverage for pollution-related damages unless the release of pollutants is "sudden and accidental," the clause eliminated from coverage a significant category of risk: pollution-related damages which are unexpected and unintended but which result from pollution released gradually over the years. This is just the sort of risk for which plaintiff seeks coverage in this case. In its prior Order, the Court gave effect to the commonly understood meaning of the word "sudden" and affirmed the insurance companies' denial of coverage.[3]

Plaintiff has submitted to the Court certain documents which he hopes will move the Court to reconsider its construction of the pollution-exclusion clause. These documents show that, at the time the pollution exclusion clause was first inserted into insurance policies (1970), the Insurance Rating Board (which represents the insurance industry and on which defendant Aetna participated) represented to the Georgia In-

---

1. Claussen has had various substantial ownership interests in the land for approximately eighteen years.

2. The Court's Order of August 11 is attached to this Order as Appendix A.

3. *See* Appendix A at 1580 ("Only in the minds of hypercreative lawyers could the word 'sudden' be stripped of its essential temporal attributes.").

surance Department that "the impact of the [pollution exclusion clause] on the vast majority of risks would be no change. It is rather a situation of clarification ... Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued...." *See* Letter from R. Stanley Smith, Manager of the Insurance Rating Board, to the Georgia Insurance Department dated June 10, 1970 (attached as Appendix B). This statement clearly understates the substantial change in coverage, worked by the pollution exclusion clause. On the basis of this statement, and others like it, plaintiff would have the Court reconsider its construction of the pollution exclusion. Plaintiff asserts that the insurance companies should be estopped from contradicting the representations made to the Georgia Insurance Department as to the effect of the pollution exclusion clause.

## II. *Analysis*

 The Court does not wish to condone the conduct of the insurance industry that plaintiff has exposed. The statements made by the Insurance Rating Board to the Georgia Insurance Department, if not fraudulent, certainly were not straightforward. The Rating Board downplayed the substantial effect the pollution exclusion clause would have on existing coverage in an effort to obtain approval for the clause's insertion into insurance policies.[4] For several reasons, however, the Court is not persuaded that its prior decision should be disturbed.

First, and most importantly, under Georgia law the Court is not to look beyond the language of a contract to ascertain its meaning when the language is clear and unambiguous. *Southern Federal Savings*

& *Loan Ass'n. v. Lyle*, 249 Ga. 284, 287, 290 S.E.2d 455 (1982); *Reuss v. Time Insurance Co.*, 177 Ga.App. 672, 673, 340 S.E.2d 625 (1986). Further, words in contracts are to be construed according to their ordinary meaning. *Stinchcomb v. Clayton County Water Auth.*, 177 Ga. App. 558, 561, 340 S.E.2d 217 (1986); O.C. G.A. § 13–2–2(2). As commonly understood, the word "sudden" in the pollution exclusion clause connotes abruptness. The gradual leaching of hazardous wastes into the ground water and soil surrounding Pickettville cannot honestly be characterized as sudden. These principles lie at the heart of the Court's analysis in its August 11 Order, and demand the same result today. Accordingly, the Court reaffirms the grant of summary judgment to Aetna, Harbor, and American Home.

Additionally, the Insurance Rating Board's representations to the Georgia Insurance Department, viewed in historical perspective, were not as devious as they appear at first glance. As noted above, prior to the insertion of the pollution exclusion clause into insurance policies, pollution-related damage was covered only if it fell within the definition of "occurrence." Occurrence, in turn, was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."[5] *See* Note, *The Pollution Exclusion Clause Through The Looking Glass*, 74 Geo.L.J. 1237, 1246–47 (1986). The insurance industry anticipated that the definition of occurrence would preclude coverage for most pollution-related damage because of the requirement that damage be unintended and unexpected to be covered. *Id.* at 1248. The insurance industry miscal-

---

4. Plaintiff's view is that the statements made in 1970 by the Insurance Rating Board were honest and prove that the pollution exclusion clause was not intended to eliminate coverage for risks such as plaintiff seeks coverage for in this action. In other words, plaintiff finds dishonesty in the insurance companies' position in this action rather than in the representations made to the Georgia Insurance Department. The Court differs, and believes that the construction urged by the insurance companies in this ac-

tion, and adopted by the Court, is the one that was originally intended. The Court finds dishonesty in the representation made to the Georgia Insurance Department in 1970 that the pollution exclusion clause would have little effect on preexisting coverage.

5. This definition continues in present policies. *See* Appendix A at 1577, n. 2.

culated: courts interpreted occurrence broadly, holding pollution-related damage to be unintended (and therefore covered) even when an insured knowingly discharged pollutants into the environment, as long as the specific damage giving rise to liability was unintended; (2) public awareness of environmental contamination grew and was accompanied by a sharp increase in pollution liability litigation. *Id.* at 1246–53. In this context, the representations made by the Insurance Rating Board were, to a degree, accurate; the insurance industry was merely trying, through the pollution exclusion clause, to prevent courts from extending coverage to risks that were not calculated into premiums under occurrence-based policies, and were not anticipated when the definition of occurrence was drafted. *Id.; See also* Developments in the Law—Toxic Waste Litigation, 99 Harv.L. Rev. 1458, 1575 (1986) ("the sharp increase in environmental litigation and the courts' broad construction of insurance policies have combined to shock the insurance industry."). Thus, in 1970, the Insurance Rating Board's representation that the pollution exclusion clause was designed to maintain the status quo was, from the standpoint of insurance companies, true.

Still, the Insurance Rating Board did fail to reveal to the Georgia Insurance Department the change in coverage worked by the suddenness requirement. This clearly worked a sharp change in prior coverage because "occurrence" expressly included "continuous or repeated exposure to conditions." *See supra,* note 4 and accompanying text. However, it is not clear whether the significance of this change was fully understood in 1970; environmental disasters such as Love Canal and Pickettville, which are the result of gradual contamination, are a relatively recent phenomenon.

Thus, the hands of the insurance companies, while not immaculate, are not as dirty as plaintiff contends. The insurance companies have not, as plaintiff suggests, perpetrated a fraud on the Court by arguing in favor of a construction which enforces the clear and unambiguous language of their policies.

Defendant Highlands Insurance Co.'s motion for summary judgment is based on the fact that its insurance policy contains a pollution-exclusion clause that does not differ in any material respect from the clauses which entitled Aetna, Harbor and American Home to summary judgment. Accordingly, Highlands Insurance Co.'s motion for summary judgment is GRANTED.

### III. *Conclusion*

For the foregoing reasons, Highlands' Motion for Summary Judgment is GRANTED. The Motion for Entry of Final Judgment of defendants Aetna, Harbor and American Home is GRANTED. Plaintiff's Motion for Extension of Discovery Time and Reconsideration of Order Granting Aetna's Motion to Quash Subpoena is DENIED. The Court finds that there is no just reason for delay and therefore directs the Clerk to ENTER FINAL JUDGMENT in favor of defendants Aetna, Harbor, American Home and Highlands. The stay of the action as to defendants Mission Insurance Co. and Mission National Insurance Co. shall continue, and defendants Federal Insurance Company and Continental Casualty Co. shall remain as defendants.

### APPENDIX A

### ORDER

In September 1985, plaintiff Henry H. Claussen brought suit in the Superior Court of Richmond County (Georgia) against defendants Aetna Casualty and Surety Company [Aetna] and Federal Insurance Company [Federal]. Plaintiff sought a declaratory judgment compelling the defendants to provide him with a defense, and to reimburse him for costs incurred as of the date of filing, in connection with an Environmental Protection Agency [EPA] investigation of plaintiff's sanitary landfill. According to the complaint, defendant Aetna's duties arise out of several comprehensive general liability insurance policies [CGL's] issued over the years by Aetna to the plaintiff, while defendant Federal owes plaintiff certain duties by virtue of that company's issuance

to plaintiff of a number of personal umbrella liability policies.

On October 28, 1985, Aetna and Federal removed the instant action to the Augusta Division of this Court. Subsequently, in June 1986, defendant Federal filed a third party complaint against defendants American Home Assurance Company [American Home], Harbor Insurance Company [Harbor], Highlands Insurance Company [Highlands], Continental Casualty Company [Continental], Cincinnati Insurance Company [Cincinnati], Mission Insurance Company [Mission], and Mission National Insurance Company [Mission National]. Each of these third party defendants was alleged to have issued, at one time or another, excess liability insurance policies of various types to the plaintiff. Federal sought a declaratory judgment as to its own duties toward plaintiff and as to the respective duties of the other excess carriers. The entire case was transferred to the Savannah Division of this Court on August 25, 1986.

In deference to a California restraining order, arising out of the liquidation of two of the defendant insurance companies, the Court granted a stay of the action as to defendants Mission and Mission National on March 16, 1987.

As to the remaining litigants, with the exception of Continental and Highlands, all parties have moved for summary judgment. Summary judgment was granted to defendant Cincinnati on March 18, 1987, on the grounds that the Cincinnati policies issued to the plaintiff did not provide coverage with respect to the time periods or types of claims involved in this litigation. The outstanding motions for summary judgment of plaintiff Claussen and defendants Aetna, Federal, Harbor, and American Home are now before the Court.

## I. BACKGROUND

At the center of the case *sub judice* is the Pickettville landfill [Pickettville], a tract of approximately fifty-two acres of land, located on the outskirts of Jacksonville, Florida. For approximately eighteen years, plaintiff Claussen has had various substantial ownership interests in Pickettville.

In May 1966, Properties & Securities, Inc. [P & S], a corporation of which plaintiff was the principal stockholder, acquired the Pickettville tract. Another company controlled by the plaintiff exploited the property, excavating sand from the site for use in the construction of runways at the Jacksonville Airport. As sand was removed from the property, the area excavated filled with water. Sand removal continued with the use of a dredge. At the conclusion of the removal process, there existed on the property a rather large and deep "lake."

In 1968, P & S and the City of Jacksonville negotiated an agreement whereby the City would acquire the right to use Pickettville as a landfill free of charge. It was Claussen's hope that the filling of the Pickettville site by the City would increase the value of the land and render it suitable for profitable resale or for development. That the water-filled sand pit on the property constituted a liability risk was also a factor taken into account by Claussen. The property was used as a landfill by the City from 1968 until approximately July 1977.

During the negotiations leading to the agreement between the City and Claussen, the City had directed plaintiff's attorney to impress upon his client that the City needed authorization to dump "anything" at Pickettville. Thus, in granting written permission to the City to utilize the property, plaintiff stated that the City would have the right to dump "garbage and other debris and material in accordance with [the City's] waste disposal needs." Whether plaintiff intended this language to allow for the dumping of toxic materials is a disputed question. It is clear, however, that over the years a substantial quantity of hazardous waste did in fact find its way onto the property.

In August 1972, P & S transferred the landfill to plaintiff Claussen; P & S was dissolved the following month.

Plaintiff personally visited Pickettville in 1972; this was plaintiff's only visit to the site prior to his receipt of notification from

the EPA in 1982 that the agency was contemplating the expenditure of public funds to investigate and take corrective action in connection with the release and threatened release of hazardous materials from the landfill. The EPA informed plaintiff that action was to be taken in accordance with the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 [CERCLA], 42 U.S.C. § 9601, *et seq.*[1] Plaintiff was advised in 1982 that, *inter alia,* the EPA considered Claussen to be a potentially responsible party [PRP] within the meaning of CERCLA. Claussen was further advised that he could either personally conduct remedial investigations and feasibility studies [RI/FS] or allow the EPA to conduct the RI/FS at Claussen's expense. A number of other potentially responsible parties, including the City of Jacksonville and several generators and transporters of hazardous materials, were also put on notice by the EPA during 1982 in connection with the Pickettville landfill.

In June 1982, Claussen met with representatives of the EPA and several PRP's. At the meeting, Claussen and the City of Jacksonville entered into an agreement to cooperate in taking certain remedial measures at the landfill. Claussen spent $2,671.50 to purchase materials; the City used those materials to construct a barrier to prevent spill-off of toxic materials into a small creek that runs through the center of Pickettville. The EPA continued to monitor the site.

In January 1983, plaintiff transferred ownership of Pickettville to Jax–51, a corporation of which Claussen is the sole shareholder.

Ultimately, the EPA determined that the barrier constructed by Claussen and the City of Jacksonville had not proved effective in stopping the flow of contaminants into the groundwater and soil surrounding the landfill. Claussen was again notified that RI/FS would have to be conducted either at government expense or by the PRP's themselves. Claussen and several

other PRP's determined that it would be economically advisable to conduct the RI/FS at their own expense. In connection with the preparation of the RI/FS, plaintiff has expended at least $12,500 to date. Plaintiff has also incurred substantial legal expenses, arising out of both his efforts to comply with EPA demands and his attempts to establish insurance coverage under various of his insurance policies with respect to the hazardous waste problem at Pickettville.

Thus far, neither the EPA nor any owner of land in the vicinity of Pickettville has instituted a civil action against the plaintiff.

## II. LAW & ANALYSIS

All of the named defendant insurers were notified, at various times during the past five years, of EPA's concern over the Pickettville property; all have denied coverage. Defendant Aetna's first line of defense is the argument (also advanced by the excess carrier movants) that, by virtue of the "pollution exclusion" provisions included in its policies, Aetna has no duty whatsoever either to defend or to afford coverage to plaintiff. The excess carriers question whether this case presents a "justiciable case or controversy." Defendant Federal argues, *inter alia,* that its policy was never intended by either it or the plaintiff to cover the Pickettville property. Various defendants have raised the argument that CERCLA response costs, such as those incurred by the plaintiff, do not constitute "property damage" within the meaning of the insurance policies under consideration.

The Court finds that those defendants that have moved for summary judgment on pollution exclusion grounds are entitled, on the referenced basis, to judgment as a matter of law. The difficult questions whether CERCLA response costs constitute property damage, *compare Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir. 1986), *with Continental Ins. Cos. v. Northeastern Pharmaceutical and Chem-*

---

**1.** An "interim priority list," published by the EPA and ranking the 115 worst hazardous waste sites in the nation, listed Love Canal as twenty-fourth, and Pickettville as twenty-sixth.

*ical Co., Inc.*, 811 F.2d 1180 (8th Cir.1987), *and United States v. Conservation Chemical Co.*, 653 F.Supp. 152 (W.D.Mo.1986), and whether there exists a justiciable case or controversy with respect to the excess carriers, need not be addressed under the circumstances of the case at bar. The potential liability of defendant Federal is a matter best left for another day.

### A. *Defendant Aetna's Motion for Summary Judgment*

Between 1973 and 1985, defendant Aetna covered plaintiff Claussen with respect to the Pickettville site under certain CGL's. All of the Aetna policies at issue cover "bodily injury or property damage" resulting from an "occurrence."[2] Each policy also contains a "pollution exclusion" clause, denying coverage for pollution-related bodily injury or property damage. The pollution exclusion clause includes an exception, which states, essentially, that the pollution exclusion does not apply where a release, dispersal or escape of pollutants is "sudden and accidental."[3] Plaintiff argues that this language in the Aetna policies relating to coverage for pollution-related property damage is ambiguous, and that Aetna is therefore obliged to provide plaintiff with a defense and to pay all expenses that have been or may be incurred by plaintiff in connection with agency or private actions concerning the Pickettville pollution problem.

The Aetna CGL's are insurance contracts delivered in Georgia to a Georgia insured; therefore, the Court must follow Georgia law in assessing the validity of plaintiff's arguments. *General Telephone Co. of the Southeast v. Trimm*, 706 F.2d 1117, 1120 (11th Cir.1983). The Georgia law relevant to the instant dispute is succinctly stated in *Fidelity & Deposit Co. of Maryland v. Sun Life Ins. Co. of America*, 174 Ga.App. 258, 329 S.E.2d 517 (1985):

> Competent parties are free to choose and insert whatever provisions they desire in a contract, unless prohibited by statute or public policy. While a policy of insurance is to be construed liberally in favor of the object to be accomplished and its provisions construed against the insurer, where a part is susceptible of two constructions, that interpretation will be adopted that is most favorable to the insured. Yet a contract of insurance should follow the cardinal rule of construction so as to carry out the true intention of the parties, and their rights are to be determined by the terms of the contract. Its language should receive a reasonable construction and not be ex-

---

**2.** The policy provides:

> [Aetna] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> > bodily injury or property damage
>
> to which this insurance policy applies caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

The policy defines certain relevant terms as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

> "Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

> "Property damage" means "physical injury or destruction of tangible property which occurs during the policy period, including the loss of use at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period; ...

**3.** Exclusion (f) of the policy states that the policy does not apply:

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such dispersal, release or escape is sudden and accidental.

tended beyond what is fairly within its plain terms. Where the language fixing the extent of coverage is unambiguous, ... and but one reasonable construction is possible, [a] court must enforce the contract as written. [A] court has no more right, by a strained construction, to make an insurance policy more beneficial by extending coverage not contracted for, than [it] would have to increase the amount of coverage.

*Id.* at 260, 329 S.E.2d 517 (citations omitted).

The terms of the Aetna CGL's are clear and unambiguous. An insured under the policies will be covered for bodily injury or property damage resulting from an *occurrence.* However, the pollution exclusion provides that coverage is not afforded with respect to pollution-related *damage,* even where the damage is the result of an occurrence. The exception to the exclusion, on the other hand, dictates in essence that if a pollution incident (discharge, escape or dispersal of hazardous materials) is *sudden* and accidental, and is otherwise an occurrence within the meaning of the policy, coverage will be afforded. The relevant terms of the contracts under consideration could not reasonably be read otherwise.

While the Court does not accept all of the arguments advanced by defendant Aetna in support of its motion for summary judgment, it is clear that, on the facts of the case at bar, plaintiff is not covered under the Aetna CGL's. Accordingly, defendant Aetna is under no duty to pay plaintiff's expenses or to defend plaintiff against EPA actions or in any other litigation concerning property damage caused by pollution from Pickettville.

Aetna argues first of all that the plaintiff is an active polluter and that insurance coverage uniformly has been denied to active polluters by other courts "interpreting the same or similar policy provisions." In support of its argument, Aetna cites, *inter alia,* the cases of *American States Ins. Co. v. Maryland Casualty Co.,* 587

F.Supp. 1549 (E.D.Mich.1984); *Jackson Township Municipal Utilities Author. v. Hartford Accident & Indemnity Co.,* 186 N.J.Super. 156, 451 A.2d 990 (1982); and *Niagara County v. Utica Mutual Ins. Co.,* 439 N.Y.S.2d 538, 80 A.D.2d 415 (1981). For the Court to rule in favor of Aetna either by finding plaintiff to be an "active" polluter or in reliance on certain of the cited opinions would be inappropriate. First, summary judgment on the former ground would not be proper because the factual question whether plaintiff had *actual* knowledge concerning the dumping of pollutants at Pickettville is a hotly disputed one. Second, the Court would be hesitant to rely on the cited opinions as appropriate statements of the law, even if plaintiff could be said to have been an active polluter. If plaintiff *did* have actual knowledge of the dumping of pollutants at the Pickettville site, clearly coverage would be precluded under the policy's definition of "occurrence" ("accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured"). An active polluter surely must be held to expect that property damage will result from active pollution; the pollution exclusion, therefore, is irrelevant in cases involving active polluters. So, to the extent that certain of the above-cited decisions advocate a different view of the matter, the Court would not find those opinions to be particularly helpful, even if plaintiff could be said to be an active polluter.

Aetna contends, alternatively, that regardless of whether plaintiff expected or intended pollutants to seep from the Pickettville site, the Aetna CGL's provide no coverage. The Court agrees. For present purposes, the Court may assume that there has been "property damage"[4] within the meaning of the policies, for the question whether CERCLA response costs or costs associated with the preparation of RI/FS constitutes property damage is irrelevant

---

**4.** The Court does not in this opinion reach the question whether CERCLA response costs constitute "property damage."

to the instant inquiry. And the Court may even grant plaintiff the benefit of the doubt and assume that plaintiff was ignorant of the continuous dumping of hazardous wastes at Pickettville or of the potential for leaching of the contaminants deposited there into the surrounding soil and groundwater. In other words, it can be assumed that plaintiff has alleged all of the necessary elements of an "occurrence," yet it will remain apparent that the Aetna policies afford plaintiff no coverage.

The above is so because, "[u]nlike the focus of the 'occurrence' language in the policies' broad coverage provisions, the focus of the 'pollution exclusion' is *not* upon intention, expectation, or even foresight. Rather, the exclusion clause is concerned less with the accidental nature of the occurrence than with the nature of the damage." *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 380 (1986) (emphasis in original, footnote omitted). The type of *damage* allegedly caused in the instant case was exactly the type of damage with respect to which the parties agreed that there would be no coverage, notwithstanding the happening of an occurrence, except under certain specified circumstances. The circumstances under which coverage would be available are specified by the exception to the pollution exclusion. Only where the release, escape or dispersal of contaminants is "sudden and accidental" would the insurance policies issued by Aetna apply.

In the instant case, if the *dumping* of hazardous wastes at Pickettville is considered the contractually relevant release, escape or dispersal of materials, clearly this dumping was not sudden; trucks were pouring toxic waste into Pickettville for approximately nine years. From a highly technical viewpoint, of course, it might be argued that the dumping was "accidental" in that it allegedly resulted in property damage unintended by Claussen. In any event, the dumping was not sudden within the meaning of the Aetna policies.[5] The same holds true if one considers the *leaching* of contaminants into the groundwater and soil surrounding the landfill as the relevant release, escape or dispersal: this leaching certainly was not sudden, even if it, too, could be said to be accidental. Either way, Aetna is under no duty to defend or indemnify. Moreover, while the foregoing indicates that policy concerns need not be taken into consideration in reaching the conclusion that the Aetna policies provide no coverage, it certainly does no disservice to public policy to hold that plaintiff's alleged ignorance with respect to the dumping or leaching of hazardous wastes at Pickettville or of the property damage resulting therefrom is irrelevant. Plaintiff owned the land in question, and a finding that a defense or coverage should be afforded where an owner disclaims knowledge with respect to the unconscionable use of his property would "pay[ ] the in-

---

**5.** The Court sees no reason to conclude that the word sudden in an insurance policy means anything different from that which it means in any other context. Nor does the reasoning of those courts that have held to the contrary appear to be especially persuasive. *See, e.g., Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (1980):

The term 'sudden and accidental' must be construed in its relevant context. The relevant context to be considered is the fact that it is a term employed by an insurer in the contract and should be given the construction most favorable to the insured. Thus, regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, if the resulting damage could be viewed as unintended by the factfinder, the total situation could be found to constitute an accident.

*Id.* 426 N.Y.S.2d at 605. *See also National Grange Mutual Ins. Co. v. Continental Casualty Ins. Co.,* 650 F.Supp. 1404 (S.D.N.Y.1986); *Independent Petrochemical Corp. v. Aetna Casualty and Surety Co.,* 654 F.Supp. 1334 (D.D.C.1986); *Payne v. United States Fidelity and Guaranty Co.,* 625 F.Supp. 1189 (S.D.Fla.1985); *Shapiro v. Public Service Mutual Ins. Co.,* 19 Mass.App. 648, 477 N.E.2d 146 (1985); *Buckeye Union Ins. Co. v. Liberty Solvents and Chemicals Col, Inc.,* 17 Ohio App.3d 127, 477 N.E.2d 1227, 1235 (1984); *Lansco, Inc. v. Department of Environmental Protection,* 138 N.J.Super. 275, 350 A.2d 520, 524 (1975) ("since the oil spill was neither expected nor intended by [the insured], it follows that the spill was sudden and accidental under the exclusion clause even if caused by the deliberate act of a third party.").

sured to keep his head in the sand." *Waste Management, supra,* 340 S.E.2d at 381.

At any rate, in drafting the pollution exclusion clause, the insurance industry clearly intended to limit coverage for pollution-related damages to situations where such damages are caused by sudden pollution incidents involving equipment malfunctions, explosions and the like. The word sudden was intended by the industry to have its usual temporal meaning, *see* Note, *The Pollution Exclusion Through the Looking Glass,* 74 Geo.L.J. 1237, 1252–53 & n. 79 (1986); Hendrick & Wiezel, *The New Commercial General Liability Forms—An Introduction and Critique,* 1986 Fed.Ins. & Corp.Couns.Q. 319, 343–46, and a reasonable insured with any degree of common sense would assume the word to have that usual meaning. *See generally Greer v. IDS Life Ins. Co.,* 149 Ga.App. 61, 253 S.E.2d 408 (1979). Only in the minds of hypercreative lawyers could the word "sudden" be stripped of its essential temporal attributes. While not all courts have agreed in this regard, recent decisions have recognized, with increasing frequency, that the pollution exclusion does mean just what it says.[6] *See, e.g., Waste Management, supra; Techalloy Co. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820, 826–27

(1984); *see generally Great Lakes Container Corp. v. National Union Fire Ins. Cos.,* 727 F.2d 30 (1st Cir.1984).[7]

Plaintiff, in seeking to establish that the Aetna policies are ambiguous, and perhaps having read the law review commentary cited above, has quoted to the Court the following language from *Through the Looking Glass:*

> "When *I* use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
>
> "The question is," said Alice, "whether you *can* make words mean so many things."
>
> "The question is," said Humpty Dumpty, "which is to be master—that's all."

L. Carroll, *Through the Looking Glass* 94 (1946) (emphasis in original). It is interesting to note that the author of the cited law review commentary employed the same language, appropriately, in support of an argument contrary to that advanced by the plaintiff. Indeed, Lewis Carroll would likely roll over in his grave if he were to examine the contentions plaintiff seeks to buttress with the author's work. In any event, the Court takes this opportunity to quote another British author, whose words

---

6. The Court acknowledges that the word "accidental," included in the exception to the pollution exclusion, is redundant, in that it needlessly reiterates that portion of the definition of "occurrence" which affords recovery only for "accidents ... result[ing] ... in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Nevertheless, it strains logic to find ambiguity in the word sudden, and this latter word is clearly an essential element of the exception to the exclusion. Thus, the *entire* clause is certainly *not* redundant. *See generally Transamerica Ins. Co. v. Sunnes,* 77 Or.App. 136, 711 P.2d 212 (1985), *review denied,* 301 Or. 76, 717 P.2d 631 (1986). It should be borne in mind, moreover, that a basic rule of contract construction directs courts to "avoid a construction that does not give all portions of the policy meaning and effect," *First Nat'l Bank of Midland v. Protective Life Ins. Co.,* 511 F.2d 731, 734 (5th Cir.1975). *See also Martindale Lumber Co. v. Bituminous Casualty Co.,* 625 F.2d 618 (5th Cir.1980). As to the fact that one author does indeed find the entire clause to be a restatement of the occurrence definition, *see* 3 R. Long, *Law of Liability Insurance* App–58 (1973), this Court

observes, first, that it seems unwise to rely too heavily on what may well have been a hastily prepared supplement to an otherwise respected and reliable treatise and, second, that no matter how many courts have accepted the interpretation suggested by the cited work, thus finding the pollution exclusion clause to be confusing or mere surplusage, *see* cases cited *supra* note 4; *see generally United Pacific Ins. Co. v. Van's Westlake Union, Inc.,* 34 Wash.App. 708, 664 P.2d 1262, 1265 (1983), it is sometimes appropriate politely to point out that the emperor has no clothes. The pollution exclusion clause is unambiguous under most circumstances, *cf. A–1 Sandblasting v. Baiden,* 53 Or.App. 890, 632 P.2d 1377 (1981), aff'd 293 Or. 17, 643 P.2d 1260 (1982) (term liquid in pollution clause does not apply to paint spilled by workmen while painting bridge), and it would seem that judicial determinations will be perceived as more credible when this fact is generally recognized.

7. The Court has found the following booklet to contain a useful collection of relevant cases. Practising Law Institute, *Hazardous Waste, Toxic Tort, and Products Liability Insurance Problems* (1987).

seem both to shed some light on the origins of the instant problem and to offer sound guidance for a reduction in the prevailing confusion:

> [I]t is clear that the decline of a language must ultimately have political and economic causes: it is not due simply to the bad influence of this or that individual writer. But an effect can become a cause, reinforcing the original cause and producing the same effect in an intensified form, and so on indefinitely. A man may take to drink because he feels himself to be a failure, and then fail all the more completely because he drinks. It is rather the same thing that is happening to the English language. It becomes ugly and inaccurate because our thoughts are foolish, but the slovenliness of our language makes it easier for us to have foolish thoughts. The point is that the process is reversible.

G. Orwell, *Politics and the English Language,* in *Collected Essays* 357 (1961).

In reliance on the clear wording of the contract between plaintiff and defendant Aetna, and in the hope that an unfortunate judicial trend can indeed be reversed, the motion for summary judgment of defendant Aetna shall be granted, and that of the plaintiff shall be denied.

The reasons stated by the Court in granting Aetna's motion for summary judgment render it unnecessary to address the question whether there exists a case or controversy with respect to the liability of excess carrier movants Harbor and American Home. Plaintiff has not denied that the three policies issued to him by Harbor, and the one policy allegedly issued to him by American Home, all included pollution exclusion provisions or endorsements essentially identical to that included in the Aetna policy. Accordingly, summary judgment shall be entered in favor of defendants Harbor and American Home.

### B. *Motion for Summary Judgment of Defendant Federal*

The policies issued to plaintiff by defendant Federal for the most part provide umbrella coverage. However, it is plaintiff's contention that provisions contained in the Federal policies dictate that if the Court should rule, as it has, that the Aetna policies do not apply to the claims here at issue, then Federal is obligated to provide plaintiff with a defense and with first-dollar coverage.

The personal umbrella liability policies issued to plaintiff by defendant Federal contain no pollution exclusion clause. Federal, however, has come forth with a number of fairly persuasive arguments in support of its contention that the Federal policies were never intended by the company or by plaintiff to cover the Pickettville property.

First of all, it is clear that Pickettville is not listed as property to be covered either in the Federal policies themselves or in the applications for coverage prepared by the plaintiff. Also, it does seem curious, as Federal has pointed out, that, on the one hand, plaintiff procured commercial excess policies from defendant Harbor and others (these commercial excess policies providing excess coverage over the underlying Aetna CGL's, which in turn specifically covered Pickettville), while, on the other hand, plaintiff procured only personal excess policies (the policies specifically covering, *inter alia,* plaintiff's home and automobiles) from defendant Federal. In addition, Federal has produced the affidavit of a senior Chubb underwriter, and a certain memorandum to file allegedly prepared by that underwriter some years ago, both of which indicate that plaintiff's insurance agent was told unequivocally that the Federal policy would not apply to commercial property. According to the affidavit, the insurance agent "understood that the property would not be covered and told [the affiant] that Claussen still wanted the personal excess policy so he would have umbrella (excess) coverage for his house and two cars." Bauer Affidavit at 3. Finally, according to Federal personnel, plaintiff paid only the standard premium for personal excess liability coverage: had the Pickettville property been covered under the policy, the additional and material risk represented by that

property would have been reflected in premiums higher than those actually paid.

Claussen claims, in response, that he does not know the insurance agent with whom the Chubb representative spoke, that if in fact there was an agreement between that agent and the Chubb representative then plaintiff should not be bound by it, and that plaintiff intended to obtain from Federal the broadest coverage possible.

While the Court has grave reservations with respect to plaintiff's claim against Federal, and while the Court is sorely tempted to rule summarily in defendant Federal's favor, *see generally Nationwide Mutual Fire Ins. Co. v. Tomlin*, 181 Ga. App. 413, 352 S.E.2d 612 (1986) (in construing policy terms, look to what reasonable person in position of insured would understand terms to mean); *Greer v. IDS Life Ins. Co.*, 149 Ga.App. 61, 352 S.E.2d 408 (1979); *Purcell v. Allstate Ins. Co.*, 168 Ga.App. 863, 867, 310 S.E.2d 530 (1983), it cannot be said at this time that there exists no genuine issue of material fact. Moreover, plaintiff has pointed out that the affidavit referred to above, and other evidence, was produced for the first time in connection with defendant Federal's motion for summary judgment. The Court disagrees with plaintiff as to the relevance of this evidence, but does agree that the "sandbagging" of one's opponents through the untimely production of evidence should not be countenanced.

Plaintiff has asked for additional time in which to depose certain parties, and the Court finds that further discovery is warranted in the instant case. Accordingly, the parties remaining in this action will be given until October 31, 1987 to conduct further discovery. If any party or parties should choose to submit renewed motions for summary judgment, such motions taking into account the changes worked by this Order on the structure of the litigation, such motions will be entertained after the close of the discovery period.

### III. ORDER

For the reasons stated, it is hereby ORDERED that the motions for summary judgment of defendants Aetna, Harbor, and American Home are GRANTED, and the motions for summary judgment of defendant Federal and plaintiff Claussen are DENIED.

The Clerk is directed to enter judgment in favor of defendants Aetna, Harbor, and American Home. The case stands dismissed as to these parties.

It is further ORDERED that plaintiff Claussen and defendants Federal, Continental and Highlands may engage in additional discovery. Discovery shall terminate on October 31, 1987.

SO ORDERED, this 11th day of August, 1987.

(s) B. Avant Edenfield
JUDGE, UNITED STATES
 DISTRICT COURT
SOUTHERN DISTRICT OF
 GEORGIA

APPENDIX B

EXHIBIT D

June 10, 1970

INSURANCE RATING BOARD
RECEIVED
JUN 11 1970

Mr. Emory Lipscomb
Rating Deputy
Georgia Insurance Department
State Capitol
Atlanta, Georgia 30334

Re: Submissions Dated May 21, 1970

(1) Manuals of Liability Insurance -
Contamination or Pollution Exclusio

(2) Contamination or Pollution Endorse:
IRB-G335 and IRB-G336

Dear Mr. Lipscomb:

This will acknowledge your letter of May 29, 1970, regarding the captioned submissions.

We had hoped the explanation furnished with the memorandum devoted to changes in the manual rules would suffice to present the current picture and what would be applicable with the implementation of the proposed endorsements.

The impact of the proposals on the vast majority of risks would be no changes. It is rather a situation of clarification which will make for a complete understanding by the parties to the contract of the intent of coverage. Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued except for the risks described in the filing.

The original effective date rule is amended to read as follows:

The exclusions are applicable to all new and renewal policies written on or after June 24, 1970.

We hope that with this explanation and amendment of the rule of application you can furnish us with an early approval.

Sincerely yours,

Manager

ESS:ps

621501

B-53