**CRYSTAL BAY GENERAL IMPROVEMENT DISTRICT, a governmental agency with jurisdiction in Washoe County, State of Nevada, Plaintiff,**

v.

**The AETNA CASUALTY AND SURETY COMPANY and Aetna Life & Casualty, Defendants.**

Civ. No. N–87–365 BRT.

United States District Court,
D. Nevada.

May 26, 1989.

William Patterson Cashill, Reno, Nev., for plaintiff.

Beasley & Holden, Gayle Brooks, Reno, Nev., for defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BRUCE R. THOMPSON, District Judge.

Plaintiff has filed a complaint for monetary damages and declaratory relief. Plaintiff's complaint is in five counts. The first is entitled "bad faith," the second "unfair insurance practices," the third "breach of the implied covenant of good faith and fair dealing," the fourth "breach of fiduciary duty," and the fifth "declaratory relief." The declaratory relief sought is a declaration that defendant's insurance policy covered plaintiff's losses and defendant is barred from recovering the $96,000 which it paid, or "loaned" to plaintiff, in effectuating a settlement. Defendant filed a motion for summary judgment on the first, second and third claims for relief. It

might just as well have moved against the whole complaint, but this suggestion is mooted by the fact that plaintiff has moved for summary judgment on defendant's counterclaims for reimbursement of the $96,000 which defendant paid.

STATEMENT OF UNDISPUTED FACTS

The plaintiff is Crystal Bay General Improvement District (CBGID) and the defendants are The Aetna Casualty and Surety Company and Aetna Life and Casualty (Aetna).

On June 18, 1982, Aetna issued a comprehensive general liability policy to CBGID. The term of this policy of insurance was for one year. By reason of this contract of insurance, Aetna agreed to pay on behalf of CBGID:

... *All sums which the insured* (CBGID) shall become legally obligated to pay as damages because of

*Bodily injury* or *property damage* to which this insurance applies, *caused by an occurrence,* and the Company shall have the right and duty to defend any suit against the *insured* seeking damages on account of such *bodily injury* or *property damage,* even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient ...

The term "property damage" is defined in the policy as follows:

'*Property damage*' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period.

"Occurrence" is defined as:

... An accident, including continuous or repeated exposure to conditions which results in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the insured;

Thus, generally speaking, the grant of insurance coverage in this policy extends cov-

erage to those situations where there existed an occurrence which caused bodily injury or property damage. However, there were several exceptions made to this grant of coverage. One of these exceptions was where the damages in question were caused by pollution and the "discharge, dispersal, release or escape" of such pollutants was both unintentional and occurred gradually over time. The exception stated that the policy of insurance did not furnish coverage for

(f) ... *Bodily injury* or *property damage* arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere of any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

On September 26, 1984, Theodore D. Geiszler, Doreen Geiszler and Stephen M. Kaiser filed a complaint against CBGID in the Washoe County District Court. Also named as defendants in that proceeding were Incline Village General Improvement District and CH2M Hill. Although several distinct claims for relief were asserted, each claim was founded upon the same essential facts. It was the position of plaintiffs Geiszler and Kaiser that the defendants had caused noxious, septic odors to emanate from the Gonowabie Pump Station and be blown into plaintiffs' property by prevailing winds. This allegation formed the basis of plaintiffs' causes of action for nuisance (first claim), continuing trespass (second claim), intentional infliction of emotional distress (third claim), and negligence (fourth claim). Under these claims, the plaintiffs Geiszler and Kaiser sought (1) general damages, (2) punitive damages, (3) an order requiring the abatement of the nuisance, and (4) an order requiring the relocation of the sewer line to a more convenient location.

After CBGID had been served with civil process, it tendered the defense of this lawsuit to Aetna. This was done by Jack I.

McAuliffe in a letter he wrote to Bill Parish at the Lucini Parish Insurance Agency on October 16, 1984. Aetna accepted CBGID's tender, and immediately assigned Paul Hamilton, a local Reno trial attorney, to handle CBGID's defense. Mr. Hamilton's first act was to obtain an open extension of time from plaintiff's attorney, Stephen Scheerer, within which to answer the Geiszler complaint.

Because counsel for third party claimants was unwilling to delay the prosecution of his clients' claims indefinitely, CBGID was put on notice on March 25, 1985, of the need to file a responsive pleading. This fact prompted Aetna to formally acknowledge the fact that it had accepted CBGID's tender of defense under a full reservation of its right to later disclaim coverage for all or a portion of that relief obtained by third party claimants should that relief be outside the coverage furnished by Aetna under its policy of liability coverage. Aetna further pointed out that its policy of insurance provided indemnity coverage for only that liability which was legally imposed upon CBGID for bodily injury and property damage resulting from its activities, and that liability coverage for an award of punitive damages would not be furnished in the event a court deciding such an issue were to conclude that an agreement to insure against punitive damages would be contrary to the public policy of the state of Nevada. Aetna then apprised CBGID that it would conduct a coverage investigation into this matter, saying:

> We will conduct any investigation and/or activity in connection with this claim under a full reservation of the Company's right to disclaim coverage at a later date. Also, the sending of this letter does not constitute a waiver of any other terms or limitations of your policy which may become applicable as further information becomes known.

In March of 1987, the claims of Theodore D. Geiszler and Steven M. Kaiser against CBGID were settled. Under this Settlement Agreement no sums of money were to be paid to third party claimants Theodore D. Geiszler and Steven M. Kaiser for damage done to their property. Rather, all sums contributed, with the exception of not more than $17,000, which was to constitute reimbursement for third party claimants' legal fees and engineering costs, were to be used for the construction of improvements to CBGID's sewer collection facilities. Specifically, a bypass system rerouting the sewage disposed through the old Washoe County Sewer District No. 1 would be built; the Gonowabie Pump Station would be remodeled so as to properly handle the decreased flow of effluent from just CBGID; and the existing force main from the Gonowabit Pump Station would be replaced with a small diameter pipe. The Settlement Agreement was not to become fully operative until a contract for the execution of these improvements had actually been executed before April 1, 1987. Once such a contract had been executed, regardless of whether the construction of these improvements was ever completed, CBGID and Incline Village General Improvement District would have satisfied their obligations under the Settlement Agreement and been entitled to third party claimants' dismissal of the lawsuit brought against them.

The amount which CBGID was required to contribute as its share of this Settlement Agreement was $96,000. Aetna preserved the right to establish through its coverage investigation or, if necessary, in an independent judicial proceeding, that Aetna's policy of insurance did not afford indemnity coverage for either all or a part of those sums advanced by Aetna in behalf of CBGID under the Settlement Agreement. CBGID accepted the proposal on or about March 9, 1987. As a consequence, Aetna contributed the sum of $96,000 which was necessary to complete the Settlement Agreement. In addition, by a separate document entitled "Mutual Release," Aetna and CBGID preserved those rights which each might have against the other. Paragraph 3 of the release expressly stated:

> 3. *Aetna Life and Casualty Company specifically reserves its right to commence an action against its insured CBGID for the recovery of any monies*

*advanced on behalf of CBGID by the terms of the 'Settlement Agreement' (Exhibit 1) in the event that Aetna Life and Casualty Company determines that insurance coverage does not exist* and CBGID reserves its right to commence an action against its insurer, Aetna Life and Casualty Company and its agents, attorneys and representatives, for the recovery of any and all costs, including attorney's fees and damages arising out of Aetna Life and Casualty providing a defense to this action, and Aetna Life and Casualty Company's handling of CBGID's claim, as well as any other matters relating to Aetna Life and Casualty Company's relationship with CBGID as insurer to insured. This Release is not effective as between Aetna Life and Casualty Company and CBGID.

Although the form of the settlement was as stated, the Settlement Agreement and the mutual releases executed by all the parties to the settlement in fact settled all claims asserted by the Geiszlers and Kaisers against the defendants, including claims for property damage, bodily injury and nuisance abatement.

These claims were not limited to the gradual discharge, dispersal (or) release" of "vapors," "fumes," "gasses," "waste materials" or "other irritants, contaminants or pollutants" onto claimant's properties. The Geiszler complaint also alleged: "16. On or about February 18, 1983 and reported in the North Lake Tahoe Bonanza on February 25, 1983, a sewage spill emanated from Gonowabie Pump Station and deposited raw sewage, effluent and waste water upon the properties of plaintiffs...."

Before February 18, 1983, there had been two other specific incidents of sewage spillage at the same location which, according to the information developed before settlement, may well have all been "sudden and accidental" within the exception to the exclusion.

The defense activities before March 9, 1987 were focused primarily on formulating proposals for and negotiating a settlement, with slight emphasis on investigation and preparation of the case for trial.

In early 1986, the attorneys for the plaintiffs and all parties involved in the design, construction, operation and maintenance of the Gonowabie Pump Station and sewage disposal system decided (agreed) that the best solution would be to construct a sewer bypass.

The total cost of construction and engineering services is estimated to be $225,000. After several meetings it was agreed that the settlement would be as follows:

1. $55,000 from Incline Village
2. $55,000 from Crystal Bay
3. $40,000 from CH2M
4. $25,000 from Hartford, the carrier for Incline Village
5. $35,000 from Aetna
6. $15,000 from Purifil

Because of the possibility of a lengthy trial with mounting defense costs, it was agreed that this would be the best solution. The insured has agreed to contribute $55,000.

In April 1986, the CBGID Board accepted the foregoing settlement.

Subsequently on December 30, 1986, the CBGID Board rescinded its approval of the settlement agreement and obtained independent counsel. Thereafter on March 30, 1987, the CBGID Board under protest approved a revised settlement agreement in which Aetna advanced $96,000 to pay both Aetna's and CBGID's shares of the settlement and Aetna and CBGID reserved rights, each against the other, respecting whether Aetna had in fact insured any liability of CBGID and whether Aetna had in fact engaged in unfair insurance practices.

## DISPUTED ISSUES OF MATERIAL FACT

The following issues of material fact are genuinely disputed:

1. Plaintiff contends and defendant denies that defendant misrepresented to the CBGID Board that the Board would be liable for and would have to defray a sub-

stantial portion of the litigation expenses if the case were not settled.

2. Plaintiff contends and defendant denies that defendant failed to adopt and implement reasonable standards for the prompt investigation of the Geiszler–Kaiser complaints.

3. Plaintiff contends and defendant denies that defendant failed to affirm or deny coverage within a reasonable time.

4. Plaintiff contends and defendant denies that defendant failed to settle unconditionally the insured's exposure to liability after the liability of the insurer had become reasonably clear.

5. Plaintiff contends and defendant denies that defendant acted in bad faith and defended the lawsuit and negotiated the settlement primarily in its own interests and for its own benefit, disregarding the interests and rights of its insured.

The foregoing is not enunciated as an exclusive statement of disputed material facts, but covers the primary contentions.

### FIRST CLAIM FOR RELIEF

■ Defendant seeks summary judgment on the first claim for relief arguing that the disputed issues of fact are not material and that to establish liability plaintiff must prove: (1) assumption by the insurer of control over the legal proceedings brought against the insured, (2) demand by the insured that the claim be settled, (3) refusal by the insurer to settle the claim within the limits of coverage, and (4) that the insurer acted in bad faith. This outlines the classical test for bad faith failure to settle on demand by a third party claimant against the insured for the policy limits. Defendant says it didn't have control of the final settlement because insured obtained independent counsel, and that the insurer did in fact settle the claim. Defendant also cites precedents to the point that an action for bad faith refusal to settle does not arise until a final judgment in excess of the policy limits is entered against the insured. This litany of elements is based on *U.S. v. Conservation*

*Chemical Co.*, 653 F.Supp. 152–244 (W.D. Mo.1986).

In this diversity action, however, Nevada law controls. *United States Fidelity & Guaranty Co. v. Peterson*, 91 Nev. 617, 540 P.2d 1070 (1975); *Farmers Home Mutual Insurance Co. v. Fiscus*, 102 Nev. 371, 725 P.2d 234 (1986). The *Peterson* case was a direct action by the insured against the insurer. There was no litigation over which the insurer assumed control. There was no demand by anyone for settlement within the policy limits. Yet, the Nevada Supreme Court found liability: "Where an insurer fails to deal fairly and in good faith with its insured by refusing without proper cause to compensate its insured for a loss covered by the policy such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." There are disputed issues of fact concerning whether the foregoing principle is applicable in this case. *Peterson* is also applicable for the principle that an instruction on punitive damages does not necessarily flow from a justifiable finding of bad faith. The *Fiscus* case, which relied on *Peterson*, is even more impressive. In *Fiscus* the insurance company refused to pay relying upon a purported exception in the insurance policy regarding damage to property from seepage or leakage of water in the dwelling. The court found that the insurance company had wrongfully denied coverage to the date of the Supreme Court decision; that the company was liable for breach of the implied covenant of good faith and fair dealing because there was no reasonable basis for denying coverage and its claims investigation procedure was "unprofessional"; that in these circumstances the defendant company was liable for damages for emotional distress, prejudgment interest and attorneys' fees both in the trial court and on appeal. These Nevada decisions support plaintiff's first claim for relief. In neither *Peterson* nor *Fiscus* had a binding final judgment been entered in excess of the policy limits.

### SECOND CLAIM FOR RELIEF

■ The motion against the second claim for relief seeking damages for unfair

insurance practices under the Nevada Unfair Insurance Practices Act (NRS 686A.010 et seq.) is based on the contention that no private right of action is available under that law. The argument is predicated on this Court's decision in *Tweet v. Webster,* 614 F.Supp. 1190 (D.C.Nev.1985) in which Chief Judge Reed thoroughly reviewed the then applicable precedents. We have no reason to disagree with his conclusion that the Act created no private right of action in favor of third party claimants against the insurer. The *Tweet* case, however, did not expressly or impliedly foreclose the possibility of a private right of action by the insured against the insurer. Where statutes do not expressly create a private right of action the determination must be based upon legislative intent. It seems to us that the legislative intent to grant a private right of action to the insured for breaches of the list of unfair practices in settling claims (NRS 686A.310) is reasonably implied inasmuch as this enactment which is patently for the benefit of insured persons would be just a lot of words if the only remedy is an action by the commissioner under NRS 686A.160 for injunctive relief. This conclusion is buttressed by the fact that the 1987 Nevada legislature amended NRS § 686A.310 by adding (1987 St. of Nev., Ch. 470 p. 1067 A.B. 811):

> 2. In addition to any rights or remedies available to the commissioner, an insurer is liable to its insured for any damages sustained by the insured as a result of the commission of any act set forth in subsection 1 as an unfair practice.

The effect to be given this amendment naturally raises the question of whether it is retrospective. In this area Nevada law is reasonably well established. In *Sheriff v. Smith,* 91 Nev. 729, 542 P.2d 440 (1975), the court held that NRS 200.030(2): "Murder of the first degree is murder which is ... (c) killing more than one person as the result of a common plan, scheme or design" meant killing more than one person pursuant to a single common plan, scheme or design. The trial court had held the statute unconstitutional because it could be interpreted to mean more than one similar plan or scheme to kill more than one person. The court noted that while the case was on appeal the Nevada Legislature had amended the statute by substituting the word "single" for the word "common" in the phrase "common plan, scheme or design," and articulated principles of statutory interpretation applicable to our problem:

> A fundamental rule of statutory interpretation is that the unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another that would produce a reasonable result.... Where a former statute is amended, or a doubtful interpretation of a former statute rendered certain by subsequent legislation, it has been held that such amendment is persuasive evidence of what the Legislature intended by the first statute. *People v. Valentine* [28 Cal.2d 121], 169 P.2d 1 (Cal.1946); *Groves v. Meyers* [35 Wash.2d 403] 213 P.2d 483 (Wash.1950).

*See also Roberts v. State,* 104 Nev. 7, 752 P.2d 221 (1988); *McKay v. Board of Supervisors,* 102 Nev. 644, 730 P.2d 438 (1986); 73 Am.Jur.2d § 354 p. 490.

There is no authorative decision holding that the Unfair Insurance Practices Act prior to 1987 did not grant a private right of action on behalf of the insured against his insurer. The sponsor of the legislation stated that A.B. 811 "would benefit the people of Nevada by *codifying existing law* that was recognized as common law in the sense of the right of a person to sue his insurance company for an act of bad faith." (Minutes of Nevada State Legislature Assembly Committee on Commerce, May 25, 1987). Thus, it is still open for consideration to decide whether a private right of action should be implied from the original version of section 686A.310 "unfair practices in settling claims." Every subdivision of this section on its face announces a requirement for the protection of the insured. The statute was intended for the benefit of the insured. The landmark case of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080,

45 L.Ed.2d 26 (1975) enumerated pertinent factors to be considered in implying a private right of action: (1) Is the plaintiff one of the class for whose especial benefit the statute was enacted? (2) Is there any indication of legislative intent, explicit or implied, to create such a remedy or deny one? (3) Is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff?

We have found no Nevada Supreme Court precedent which discusses the *Cort* factors. But the case of *Hamm v. Carson City Nugget*, 85 Nev. 99, 450 P.2d 358 (1969), dealt with the subject matter and held that dram shop civil liability should not be implied from a criminal statute making it unlawful for a person in charge of a bar or saloon to sell intoxicating liquor to one who is drunk. In doing so the Court, seeking the legislative intent, placed emphasis on the fact that the preceding section of the law had expressly provided for civil liability of a saloon proprietor who sells liquor to a minor. "By providing for civil liability in one section and failing to do so in the section immediately following, the legislature made its intention clear." (*Hamm* at p. 102, 450 P.2d 358). This is an implicit indication of legislative intent pertinent to the second *Cort v. Ash* factor.

The three Nevada federal court cases concerned with implication of a private right of action in state legislation have emphasized this same guide to legislative intent. In *Moen v. Las Vegas International Hotel, Inc.*, 402 F.Supp. 157 (D.C.Nev. 1975), the Nevada statutes expressly provided a civil remedy for wages earned and unpaid in the same chapter that was silent on the pooling of tips. In *Texas International Airlines, Inc. v. Bryan*, 522 F.Supp. 1182 (D.C.Nev.1981), the court construed Nevada's corporate takeover statute which provided express civil remedies for the offeree and none for the target corporation and relied upon the subsequent refusal of the legislature to amend the statute to provide for injunctive relief for the target corporation as strong evidence of legislative intent. Also, in *Nunez v. Sahara Nevada Corp.*, 677 F.Supp. 1471 (D.Nev.1988), the court relied heavily on other sections of

NRS Chapter 613 "Employment Practices" which expressly provided for private civil remedies in concluding that plaintiff had no private right of action arising from the section making it unlawful to discharge an employee upon the report of a spotter which provided no private remedy. In each of these cases, *Moen, Texas International* and *Nunez*, Nevada statutes were construed against the implication of a private right of action, but the reasons given are not present here.

The Nevada Insurance Practices Act expressly provides only criminal (§§ 686A.070(3), 686A.290, 686A.291, 686A.140(1)) and civil penalty (§§ 686A.140(4), 686A.160, 686A.170(2), 686A.140(2), 686A.187, 686A.220(5), 686A.510), mostly enforceable at the option of the commissioner. The Act is silent on private rights of action, yet the designation of unfair practices in settling claims is obviously for the benefit of purchasers of insurance. The insurance commissioner does not have the staff and resources to investigate each denial of coverage or charge of unfair settlement practices. The situation cries out for enforcement by remedies for the person injured. The implication of such a remedy is entirely consistent with the underlying purpose of the legislative scheme and this was acknowledged by the amendments made by the 1987 legislature. True, the 1987 legislature also eliminated the "general business practice" requirement of the original act, but the existence of the requirement is not inconsistent with the implication of a private right of action; it only made proof more difficult.

Finding an implied right of action for the benefit of the insured is not inconsistent with the *Tweet* case, *supra,* which was concerned only with legislative intent vis-a-vis a third party claimant. In fact, that issue is still with us, and legislation is presently being considered by the 1989 Nevada legislature to expressly provide for action by a third party claimant for violation of the unfair claims settlement practices act by insurance companies.

## INTERPRETATION OF COVERAGE

■ The policy excludes damage arising from the discharge or release of fumes, gasses, waste materials or pollutants into the atmosphere or onto land, *unless* the discharge or release was *sudden* and *accidental.* The third party complaint alleged both gradual emissions and one sudden and accidental emission and discharge. Determination of the actual facts might have resulted in: (1) a conclusion that the exclusion applied because claimant's damages were solely the consequence of the manner in which the sewage disposal system was designed and constructed causing leakage and noxious emissions (*Claussen v. Aetna Casualty & Surety Co.,* 676 F.Supp. 1571, 1578–9 (S.D.Ga.1987)), (2) a conclusion that claimant's damages were solely caused by the three sudden and accidental spillages identified in the pre-settlement investigations, (3) a conclusion that claimant's damages were caused by a combination of (1) and (2).

There is no issue with respect to whether the insurer had an obligation to investigate and defend the Geiszler–Kaiser lawsuit. This is conceded. There are, nevertheless, serious disputes respecting the scope and character of the duties and responsibilities imposed on it by the insurance contract. Aetna wrote a reservation of rights letter. A possible implication from the letter is that it intended to investigate and defend the action with the purpose of establishing that the sudden and accidental spillage exception to the exclusion was not applicable, either because there were no such occurrences of significance or because such occurrences, if any, were not causes of the damages of which claimants were complaining. Ultimately, the conflict of interest with its insured was recognized, and was followed with a suggestion that the insured might desire to procure its own counsel, allegedly at its expense.

The duties of an insurer in a conflict of interest situation have been reviewed in a variety of situations. In this case the insurer undertook the defense and the control of the investigation and settlement of the litigation. In these circumstances the law requires that the insurer give equal consideration in good faith to the interests of the insured as well as its own interests. *National Service Industries v. Hartford Accident and Indemnity Co.,* 661 F.2d 458 (5th Cir.1981); *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502 (1969). This duty must be exercised with due consideration of general negligence principles and good faith standards. In *Bollinger,* the court observed:

As Professor Keeton suggests, equal consideration of the conflicting interests of the company and the insured means consideration of each portion of the total risk without regard to who is bearing that portion of the risk. Stated differently, it means consideration of the risk as a unit without regard to who is bearing each portion of the risk. This undoubtedly is the meaning intended by courts which have said the insurer must accord the interests of its insured the same faithful consideration it gives its own interests, and that the fairest method of balancing the interests is for the insurer to treat the claim as if it alone were liable for the entire amount. (*American Fidelity Cas. Co. v. L.C. Jones Trucking Co.,* [Okla.], 321 P.2d 685 [1957]; *Kuzmanich v. United Fire and Casualty Co.,* 242 Or. 529, 410 P.2d 812 [1966]; *Cowden v. Aetna Cas. & Surety Co.,* 389 Pa. 459, 134 A.2d 223 [1957]; *Bell v. Commercial Insurance Co. of Newark, N.J.,* 280 F.2d 514 [3d Cir.1960], applying Pennsylvania law.)

A statement of the Arizona court in *General Accident Fire & Life Assur. Corp. v. Little,* supra [103 Ariz. 435, 443 P.2d 690 (1968)] supports our conclusion as to the proper application of the equal consideration doctrine:

' * * * the evaluation of a case should not be determined by looking to the policy limits. When an insurance company evaluates a claim without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on that claim it views that claim objectively, and in doing so renders "equal consideration" to the interests of itself and the insured. (Citing cases.)' (p. 696 of 443 P.2d.)

The result is that under the negligence test the insurer must conduct itself with

that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim. Likewise, under the good faith test, the insurer must in good faith view the situation as it would if there were no applicable policy limits. (Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136 at 1147–1148.)

There is also respectable authority for the proposition that in a conflict of interest situation the right of the insurer to control the defense, investigation and settlement of the action includes the obligation to pay the reasonable value of the legal services and costs incurred for independent counsel for the insured. *Executive Aviation, Inc. v. National Insurance Underwriters,* 16 Cal.App.3d 799, 94 Cal.Rptr. 347, 354 (1971); *Cay Divers, Inc. v. Raven,* 812 F.2d 866 (3d Cir.1987). The foregoing observations concerning applicable legal principles are not stated as final determinations inasmuch as neither party in the extensive briefs saw fit to discuss these areas of jurisprudence.

In consideration of the premises,

IT HEREBY IS ORDERED that all motions and cross motions for summary judgment are denied.