599 S.E.2d 673

**Linn ROSE and Adam Rose, By and Through his mother and legal guardian, Linn Rose, Plaintiffs Below, Appellees,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and Stephen Brown, Defendants Below, Appellants,**

v.

**Joseph KATARINCIC, Esq., Carl DePasquale, Esq., and Chad A. Ciccone, Esq., Third–Party Defendants Below.**

No. 31317.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 8, 2003.

Filed: June 25, 2004.

Davis, J., concurred and filed a separate opinion.

Maynard, C.J., concurred in part, dissented in part, and filed opinion.

**252**

Joseph J. John, Esq., Anthony I. Werner, Esq., Paul T. Tucker, Esq., Bachmann, Hess, Bachmann & Garden, Wheeling, for Appellees.

James S. Crockett, Jr., Esq., Mary M. August, Esq., Spilman, Thomas & Battle, Charleston, for Amicus Curiae West Virginia Insurance Federation.

Michael J. Farrell, Esq., Charlotte A. Hoffman, Esq., Farrell, Farrell & Farrell, Huntington, West Virginia, for Appellants.

E. Kay Fuller, Esq., Martin & Seibert, L.C., Martinsburg, for Amicus Curiae Progressive Paloverde Insurance Company.

STARCHER, Justice.

In this appeal of an order from the Circuit Court of Ohio County, an insurance company and an insurance claims representative challenge the circuit court's conclusion that a defense attorney, hired by the insurance company to defend the interests of an insured in a liability matter, was subject to the provisions of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to 33–11–10. The circuit court ruled that the duties imposed by the Act upon the insurance company are not delegable, and that the insurance company could be held liable for any violations of the Act by a defense attorney employed by the insurance company to defend an insured in an underlying medical malpractice case.

As set forth below, we affirm, in part, and reverse, in part, the circuit court's order. We reverse the circuit court's conclusion regarding the duties of a defense attorney under the Act, and hold that a defense attorney who is employed by an insurance company to represent the interests of an insured in a liability matter is not directly subject to the provisions of the Act. However, we affirm the circuit court's order to the extent that it holds that an insurance company is not relieved of its duty to comply with the Act by employing a defense attorney to represent the interests of an insured, and may be found liable under the Act for its own actions when it knowingly encourages, directs, participates in, relies upon, or ratifies certain wrongful litigation conduct of a defense attorney.

## I.

### *Facts & Background*

Appellee Linn Rose brought the instant action against appellant St. Paul Fire and Marine Insurance Company ("St.Paul") and one of its claims handlers, appellant Stephen Brown, for violations of the West Virginia Unfair Trade Practices Act ("UTPA"). Ms. Rose alleges that the appellants violated the Act by directing, ratifying, participating in, or acquiescing to the misconduct of certain defense attorneys who were employed by the appellants to defend a doctor insured by St. Paul against a medical malpractice claim filed by appellee Rose.

Ms. Rose's malpractice claim began on August 21, 1998, when Dr. David Shaffer performed an outpatient surgical procedure and negligently burned through the appellee's spinal accessory nerve. After the surgery, the appellee experienced pain in her shoulder and difficulty moving her right arm. As time passed her trapezius muscle began to wither and her shoulder began to droop. A physician at the Cleveland Clinic diagnosed and repaired the error in March 1999, but the disfigurement to the appellee's shoulder was permanent.

In January 2000, appellee Rose sued Dr. Shaffer for medical malpractice. Dr. Shaffer

referred the lawsuit to his malpractice insurance company, appellant St. Paul, and St. Paul retained defense attorney Joseph Katarincic to defend Dr. Shaffer. During the course of litigation, the appellee asserts that Mr. Katarincic and an associate, Carl DePasquale, engaged in numerous improper acts—and that Mr. Brown, who was a St. Paul employee and the claims adjuster assigned to the case, assisted, encouraged, approved, and/or acquiesced in those improper acts. The appellee asserts that St. Paul can be held liable for the conduct of the defense attorneys, as well as for the conduct of Mr. Brown in tolerating, encouraging or assisting that behavior.

An example of litigation misconduct cited by the appellee is Dr. Shaffer's September 2000 deposition testimony, where he asserted

that his hospital privileges had never been revoked or suspended.[1] The appellee has since discovered notes in St. Paul's records, recording a conversation between Mr. Brown and Mr. Katarincic in August 2000, to the effect that Dr. Shaffer's hospital privileges had in fact previously been suspended.[2] In a report later written by Mr. Brown regarding the appellee's case, a report which justified the ultimate settlement of the malpractice case, Mr. Brown again stated that "[i]n the fall and winter of 2000, we learned that Dr. Shaffer had his privileges at both of the hospitals in Wheeling revoked." The appellee argues that Mr. Brown, St. Paul, and Mr. Katarincic knew that Dr. Shaffer was being less than truthful in his deposition testimony in September 2000, but made no attempt to correct or amend his statement.[3]

1. The appellants suggest that information regarding the suspension or revocation of Dr. Shaffer's privileges in 2000, nearly two years after the appellee's surgery, would not necessarily have been admissible at trial under Rules 403 and 404(b) of the *Rules of Evidence*.

2. The August 21, 2000 note states:

Steve Brown and I got on the phone today with Katarincic, and he does a nice job distilling the issues to a more compact appreciation of what the case is about.... Dr. Shaffer is now in a stew over privileges at two hospitals ... he is trying to relocate and start anew. His problems stem from professional care and some concerns regarding his private life.... [I]n the last 30 days or so the insured's reputation has become clouded, he would not fess up to us about the reasons, and there is a likely leak at the Wheeling Hospital that will spread the word to the plaintiff bar in the panhandle.

3. As additional evidence that the appellants, St. Paul and its employee Mr. Brown, had a general business practice of facilitating misconduct by the defense attorneys, Mr. Katarincic and Mr. DePasquale, including their use of false testimony, the appellee cites to records taken from another malpractice lawsuit that was filed against Dr. Shaffer. In the other lawsuit, the plaintiff's attorney sought to take the deposition of a doctor who had shared a medical practice with Dr. Shaffer.

It appears that this former medical partner had parted ways with Dr. Shaffer in a less-than-amicable way. The appellee suggests that Mr. Brown believed that the former medical partner might give unfavorable testimony about Dr. Shaffer, so Mr. Brown hired a separate lawyer to represent the former medical partner in his deposition. Mr. Brown's notes reflect that he directed the lawyer to work with Dr. Shaffer's

defense attorney to coordinate both doctors' testimony:

The pltfs atty has noticed [the former medical partner]'s deposition and I have hired [a separate lawyer] to represent him at the deposition.... I think it is essential that [the former medical partner] and Shaffer are on the same page. I have asked [the separate lawyer] and DePasquale to accomplish this.

Dr. Shaffer's former medical partner then testified in a manner favorable to Dr. Shaffer.

In a subsequent lawsuit between Dr. Shaffer and the former medical partner over money issues, the former medical partner admitted that his favorable deposition testimony was "not correct:"

Q. Do you remember being asked, quote, "How was it that Dr. Shaffer became unemployed with your corporation?" End quote.

A. No.

Q. Do you remember answering, quote, "He just decided to go on his own." End quote.

A. That was not correct.

Q. Do you remember being asked the question, quote, "Was there any dissatisfaction on your part with regard to Dr. Shaffer and any of his business practices or the way he practiced medicine?" End quote.

A. No. I don't remember.

Q. Do you remember your answer being, "The way he practiced medicine was fine." End quote. Do you remember that?

A. Yeah. Probably twisted that a little bit.

Q. Are you saying that you didn't tell the truth?

A. Yeah, probably a little bit shady there.

Q. Why did you do that?

A. Because I was trying to cover his ass....

Q. So what's the truth?

A. The truth is he's a no good surgeon. I didn't want to be associated with him any more, and on October 9th, I kicked him out.

Several weeks before trial, on March 29, 2001, the appellee settled her medical malpractice action against Dr. Shaffer for $800,000.00. After the settlement, and during discovery in the instant case, the appellants produced a confidential, internal "loss report" prepared by Mr. Brown discussing the settlement in which he stated that there was "no chance to successfully defend this case" and estimated the "full value" of the appellee's damages at $1.25 million.

On October 21, 2001, the appellee brought the instant action under the UTPA against appellants St. Paul and Mr. Brown.[4] The appellee's complaint asserted, among other theories, that the appellants should be held liable for the litigation misconduct of the defense attorneys hired to defend Dr. Shaffer. The complaint alleges, in part:

> [Appellants] have acted wrongfully, and in contravention of the law, in relation to [appellees]' claims of the underlying action. Their wrongful and illegal conduct includes:
>
> a. directing, acquiescing, participating in, and/or ratifying unlawful and improper behavior committed by counsel retained to defend Dr. Shaffer; . . .
>
> f. asserting defenses to the claims, which defenses had no basis in law nor fact;
>
> g. engaging in unreasonable and abusive discovery;
>
> h. unlawfully communicating with [appellee] Linn Rose's healthcare providers.

The appellants later filed a motion seeking to dismiss those portions of the appellee's case that would hold St. Paul liable under the UTPA for the litigation conduct of defense counsel. The circuit court, in a hearing on the issue, stated that "the conduct of anybody acting on behalf of the insurance company is attributable to the insurance

company." The court subsequently entered an order on September 12, 2002, specifically stating that:

> [T]he duties imposed upon defendants [St. Paul and Mr. Brown] under § 33–11–4(9) of the West Virginia Unfair Trade Practices Act are not delegable, and that the defendants can be held liable for the conduct of the attorneys employed to defend the underlying action against Dr. Shaffer to the extent that the conduct implicates the various provisions set forth in § 33–11–4(9) of the Unfair Trade Practices Act.

The circuit court declared that its order was a final order entered pursuant to Rule 54(b) of the *Rules of Civil Procedure* and, finding that there was "no just reason for delay," directed "the entry of final judgment on the issues addressed herein for purposes of appeal."

St. Paul and Mr. Brown now appeal the circuit court's September 12, 2002 order.

## II.

### Standard of Review

■ The issues raised by the parties in the instant appeal require an interpretation of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

## III.

### Discussion

The appellants' primary contention on appeal is that the provisions of the UTPA apply

---

To further bolster their claim that the appellants knowingly encouraged the use of false testimony, the appellee cites to evidence from another medical malpractice lawsuit, against a different doctor, but administered by Mr. Brown and defended by Mr. Katarincic and Mr. DePasquale. In that case, the defense attorneys allegedly induced the defendant doctor to execute two false affidavits in support of a motion for summary judgment—affidavits that later resulted in the doctor being convicted of false swearing. *See State ex rel. Porter v. Recht*, 211

W.Va. 396, 566 S.E.2d 283 (2002) (holding that although both affidavits contained ten statements, prosecutor could charge doctor with only two counts of false swearing, not twenty).

4. The appellants, St. Paul and Mr. Brown, subsequently brought a third-party action for contribution and indemnification against the attorneys who worked on Dr. Shaffer's case: Joseph Katarincic, Carl DePasquale, and Chad Ciccone.

only to people, entities or their agents who are engaged in the business of insurance. The appellants contend that defense attorneys hired to defend an insured pursuant to a liability insurance policy are not subject to the provisions of the UTPA because they are not engaged in the business of insurance, but rather are engaged in the practice of law.[5]

The appellee responds that she is not pursuing a case against the defense attorneys, but is only contending that the appellants violated the UTPA by the manner in which they directed, ratified, encouraged, participated in, or acquiesced to the actions of the defense attorneys. The appellee contends that an insurance company should be held liable for the wrongful acts or omissions of an attorney hired to defend an insured, particularly when those acts or omissions were directed, commanded, or knowingly authorized by the insurance company.

■ The issue raised by the parties requires us to interpret the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus Point 1, *Smith v. State Workmen's Compensation Com'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). "Once the legislative intent underlying a particular statute has been ascertained, we proceed to consider the precise language

thereof." *State ex rel. McGraw v. Combs Services,* 206 W.Va. 512, 518, 526 S.E.2d 34, 40 (1999). Moreover, when we interpret a statutory provision, this Court is bound to apply, and not construe, the enactment's plain language. We have held that "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syllabus Point 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951).

■ The stated purpose of the UTPA "is to regulate trade practices *in the business of insurance* . . . by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." *W.Va.Code,* 33–11–1 [1974] (emphasis added). The Act achieves this purpose by expressly prohibiting any "person" from engaging "in any trade practice which is defined in this article as, or determined pursuant to section seven [*W.Va.Code,* 33–11–7] of this article to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." *W.Va.Code,* 33–11–3 [1974]. For example, in *Taylor v. Nationwide Mut. Ins. Co.,* 214 W.Va. 324, 589 S.E.2d 55 (2003),

---

5. A secondary issue contained within the parties' arguments concerns the application of the *Rules of Civil Procedure,* the *Trial Court Rules,* and the *Rules of Professional Conduct* to litigation misconduct by an insurance defense attorney, and the availability of remedies under those rules for that misconduct. The appellants argue that these rules are more than adequate for protecting litigants against an attorney's misconduct, and argue that the rules do not provide for a "new tort for litigation misconduct in the guise of [a] statutory bad faith claim" under the UTPA.

The appellee counters that these rules certainly provide for sanctions for litigation misconduct, but those sanctions apply only to the attorneys and litigants, and not entities that are not party to the lawsuit. In other words, the appellee argues that because an insurance company that insures a litigant—like St. Paul in the appellee's underlying malpractice lawsuit against Dr. Shaffer—is not a party to a tort action, the insurance company cannot be sanctioned under these rules. The appellee suggests that the insurance company could knowingly direct, command, authorize,

rely upon and benefit from a defense attorney's misconduct—but only the defense attorney could be penalized by the trial court. Further, the appellee argues that the appellants actively concealed information regarding much of the defense attorneys' misconduct, preventing its discovery until long after the underlying suit was resolved. Lastly, these rules are largely tools for trial courts to manage their courtrooms, and do not allow a claimant to recover the full panoply of damages—such as compensatory or punitive damages—that are available under the UTPA. The appellee therefore argues that the *Rules of Civil Procedure,* the *Trial Court Rules,* and the *Rules of Professional Conduct* provide an inadequate deterrent and remedy for litigation misconduct by an insurance defense attorney.

Because we conclude that under the language of the UTPA a defense attorney hired by an insurance company to defend an insured is not subject to the provisions of the UTPA, we decline to go further and examine the interplay between the UTPA and the *Rules of Civil Procedure,* the *Trial Court Rules,* and the *Rules of Professional Conduct.*

we concluded that a claims adjuster employed by an insurance company is a "person" in the business of insurance who is subject to regulation under the UTPA. A claimant may bring an action for damages, including expenses, attorney's fees, and punitive damages, caused when a person in the business of insurance violates the UTPA. *Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds by State ex rel. State Farm Fire & Cas. Co. v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994).[6]

■ The Act is specifically designed, by its own terms, to regulate only those entities and individuals who are engaged in the "business of insurance." In *Hawkins v. Ford Motor Co.,* 211 W.Va. 487, 566 S.E.2d 624 (2002), we considered the meaning of the phrase "business of insurance," and whether a self-insured company met that definition. We focused our analysis on the legislatively-stated definitions of "insurance," "insurer," and "transacting insurance:"

The West Virginia Code defines insurance as "a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies." W.Va.Code § 33–1–1 (1957). An "[i]nsurer is every person engaged in

6. Virtually all states impose upon insurance companies a duty to settle liability claims where the insured is likely to be exposed to damages in excess of the insurance policy limits. An insurance company's breach of this duty can result in a "bad faith" lawsuit against the company to recover the claimant's full damages, regardless of policy limits. *See* Stephen S. Ashley, *Bad Faith Actions: Liability & Damages,* §§ 2:04–06 (2d. ed.1997). *See also, Shamblin v. Nationwide Mut. Ins. Co.,* 183 W.Va. 585, 599, 396 S.E.2d 766, 780 (1990) (*prima facie* case of "bad faith" is made when insured shows insurance company failed to settle a claim within policy limits and gain insured's release from personal liability, where there was an opportunity to do so).

At least sixteen states, including West Virginia, also use statutes to impose various duties upon insurance companies to use "good faith" toward a claimant throughout the settlement of a claim. These statutes—which, like West Virginia's, are usually patterned after the National Association of Insurance Commissioners' "Model Unfair Trade Practices Act" or "Model Unfair Claims Settlement Practices Act"—have been construed by courts to allow a claimant to bring an action against an insurance company for damages caused by a violation of the statute. *See, e.g., Rankin v. Allstate Ins. Co.,* 336 F.3d 8 (1st Cir. 2003) (interpreting Maine statute requiring "prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear"); *Gray v. North Carolina Ins. Underwriting Ass'n,* 352 N.C. 61, 529 S.E.2d 676 (2000); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 734 A.2d 901 (Pa.Super.1999); *Theriot v. Midland Risk Ins. Co.,* 694 So.2d 184 (La.1997); *Auto-Owners Ins. Co. v. Conquest,* 658 So.2d 928 (Fla.1995); *Urban v. Mid–Century Ins. Co.,* 79 Wash. App. 798, 905 P.2d 404 (1995); *New Mexico Life Ins. Guar. Ass'n v. Quinn & Co., Inc.,* 111 N.M. 750, 809 P.2d 1278 (1991); *State Farm Mut. Auto. Ins. Co. v. Reeder,* 763 S.W.2d 116 (Ky. 1988); *Crystal Bay General Imp. Dist. v. Aetna Cas. & Sur. Co.,* 713 F.Supp. 1371 (D.Nev.1989); *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129 (Tex.1988); *Shaheen v. Preferred Mut. Ins. Co.,* 668 F.Supp. 716 (D.N.H.1987) (consumer may file private action under insurance unfair trade practice statute if insurance commissioner first finds insurance company violated the statute) (*see also, WVG v. Pacific Ins. Co.,* 707 F.Supp. 70 (D.N.H.1986) (suit allowed against insurance company under consumer protection act)); *Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 448 N.E.2d 357 (1983); *Klaudt v. Flink,* 202 Mont. 247, 658 P.2d 1065 (Mont.1983) (*superseded on other grounds by statute, O'Fallon v. Farmers Ins. Exchange,* 260 Mont. 233, 859 P.2d 1008 (1993)); *Griswold v. Union Labor Life Ins. Co.,* 186 Conn. 507, 442 A.2d 920 (1982); *Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982). *See also, Heyden v. Safeco Title Ins. Co.,* 175 Wis.2d 508, 498 N.W.2d 905 (Ct.App.1993) (*overruled on other grounds by Weiss v. United Fire and Cas. Co.,* 197 Wis.2d 365, 541 N.W.2d 753 (1995)) (regulations under unfair claims settlement statute admissible as proof insurance company acted unreasonably under the circumstances and therefore in bad faith); *Walston v. Monumental Life Ins. Co.,* 129 Idaho 211, 216, 923 P.2d 456, 461 (1996) (violation of the unfair claims settlement practices statute constitutes evidence of an extreme deviation from customary practices "relevant to the state of mind that is necessary to establish fraud."); *State Farm Mut. Auto. Ins. Co. v. Weiford,* 831 P.2d 1264 (Alaska 1992) (trial court did not err in basing "bad faith" jury instruction upon state's unfair trade practices statute); *Ford Motor Credit Co. v. Manzo,* 196 Ill.App.3d 874, 143 Ill.Dec. 545, 554 N.E.2d 480 (1990) (insurance company's violation of the unfair claims settlement practices statute established that its conduct was vexatious). *Compare Farmer's Union Central Exchange, Inc. v. Reliance Ins. Co.,* 626 F.Supp. 583 (D.N.D.1985) (finding North Dakota would allow third-party claims under the Model Act) with *Farmer's Union Central Exchange, Inc. v. Reliance Ins. Co.,* 675 F.Supp. 1534 (D.N.D.1987) (rejecting argument that North Dakota would allow third-party claims).

the business of making contracts of insurance." W.Va.Code § 33–1–2 (1957). Specifically, "[t]ransacting insurance includes solicitation and inducement, preliminary negotiations, effecting a contract of insurance and transaction of matters subsequent to effecting the contract and arising out of it." W.Va.Code § 33–1–4 (1957). 211 W.Va. at 491, 566 S.E.2d at 628. Putting these definitions together, we concluded that even though a company may choose to insure its own losses, if the primary purpose of the company is some venture other than dealing in insurance—that is, the company is under no contractual obligation to pay a claim and does not "transact[ ] insurance" as defined by law—then the company is not in the "business of insurance" and not subject to the regulation of the UTPA. We stated, in Syllabus Point 2 of *Hawkins,* that:

> The Unfair Trade Practices Act, W.Va. Code §§ 33–11–1 to—10, and the tort of bad faith apply only to those persons or entities and their agents who are engaged in the business of insurance.

We held in *Hawkins* that the self-insured company at issue—Ford Motor Company— primarily manufactured and sold cars and did not engage in the business of insurance, and was therefore not subject to the UTPA.

█ In the instant case, we do not perceive a defense attorney, employed by an insurance company to represent an insured in a liability matter, to be a person who is "in the business of insurance." There is nothing to suggest that the defense attorneys in this case had any contractual obligations to pay the appellee's claim against Dr. Shaffer, nor anything to suggest the defense attorneys made, solicited, negotiated, or otherwise directly acted in any manner pursuant to the terms of an insurance contract. The defense attorneys were employed by the insurance company to defend the interests of the in-

sured; the insurance contract at issue bound only the insurance company and the insured. The defense attorneys' ethical attorney-client obligations were to the insured, Dr. Shaffer. *State ex rel. Allstate Ins. Co. v. Gaughan,* 203 W.Va. 358, 372, 508 S.E.2d 75, 89 (1998). Any obligations imposed by an insurance contract were between Dr. Shaffer and St. Paul, and the defense attorneys were neither parties to nor bound by that contract. *See* ABA Formal Opinion 01–421, "Ethical Obligations of a Lawyer Working Under Insurance Company Guidelines and Other Restrictions," 30 *Brief* 45, 46 (Summer 2001) ("[T]he rules of professional conduct—and not the liability insurance contract—govern the lawyer's ethical obligations to his client[.]").

█ We therefore conclude that under these circumstances, a defense attorney who is employed by an insurance company to represent an insured in a liability matter is not engaged in the business of insurance. The defense attorney is therefore not directly subject to the provisions of the West Virginia Unfair Trade Practices Act.[7]

█ Our holding does not, however, absolve the appellants from all potential responsibility under the UTPA. While attorneys and other individuals who are not in the business of insurance are not directly bound by the UTPA, an insurance company and its employees who *are* in the business of insurance must continue to comply with the UTPA, even if a defense attorney has been hired by the insurance company to defend a claim against an insured. A claimant can establish a violation of the UTPA by showing that an insurance company, through its own actions, breached its duties under the Act by knowingly encouraging, directing, participating in, relying upon, or ratifying the wrongful litigation conduct of a defense attorney hired by the insurance company to represent an insured. Actionable wrongful litigation con-

---

7. We emphasize, however, that our analysis in this case is focused upon whether an independent attorney, hired by an insurance company to defend the interests of a defendant-insured under a liability insurance policy against a claim made by a plaintiff, is in the "business of insurance." We do not consider, and make no judgment upon, the case of an attorney who is hired by an insurance company in other circumstances— such as to investigate or give advice upon the validity of a claim in the same fashion as a company claims representative; to defend the interests of the insurance company; or an attorney·who works "in house" for the company or in a "captive" law firm that is employed exclusively by the insurance company to represent only the company's insureds.

duct by a defense attorney, to be binding on the insurance company, is conduct that, if it were committed by a person or entity in the business of insurance, would constitute a violation of the UTPA.

For example, the UTPA makes clear that an insurance company must fully investigate an insurance claim, and make a reasonable offer to settle the claim if warranted by the evidence. *W.Va.Code,* 33–11–4(9)(c) requires an insurance company to have "reasonable standards for the prompt investigation of claims arising under insurance policies," while *W.Va.Code,* 33–11–4(9)(d) states that the company may not "[r]efus[e] to pay claims without conducting a reasonable investigation based upon all available information[.]" With the information obtained from the investigation, *W.Va.Code,* 33–11–4(9)(f) requires the insurance company to "attempt[ ] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

An insurance company can be held liable for its own actions—regardless of the actions of any insurance-company-hired defense attorney—in failing to comply with these statutory requirements in the course of resolving a claim. So, for instance, if a claimant was able to establish that an insurance company knew that a defense attorney was engaging in litigation misconduct (say, offering the perjured testimony of a witness) and the insurance company knowingly encouraged, directed, participated in, relied upon, or ratified that misconduct (say, by not seeking out other known witnesses and knowingly using the perjured testimony as a basis for refusing to settle the claim), then a jury could fairly conclude that the insurance company had failed to conduct a reasonable investigation and failed to make a "good faith" attempt to settle the case as required by the Act. *See, e.g.; Federated Mut. Ins. Co. v. Anderson,* 297 Mont. 33, 43, 991 P.2d 915, 922 (1999) (after court made judicial determination insurance coverage existed under policy, insurance company violated unfair trade practices act by continuing to deny coverage and having attorney file a "meritless appeal" that included inconsistent and conflicting positions, inaccurate citations to authority, and lack of support for claims on appeal, because "[m]eritless appeals are not legitimate litigation conduct.")

IV.

*Referral to the Office of Disciplinary Counsel*

■ Our review of the record suggests that the attorneys employed by appellant St. Paul to defend Dr. Shaffer may have engaged in numerous violations of the *Rules of Professional Conduct.* For instance, it appears that Mr. DePasquale represented Dr. Shaffer and other West Virginia doctors at the behest of both St. Paul and Mr. Katarincic in several West Virginia courtrooms—yet he was never licensed or admitted *pro hac vice* to practice law in West Virginia. The record is unclear whether any of the possible violations have been considered by the Office of Disciplinary Counsel, or the state bar disciplinary authorities of any other state where Mr. Katarincic or Mr. DePasquale are licensed.

In light of the many potential transgressions in the record, we find it necessary to refer this matter to the Office of Disciplinary Counsel for further review, in accordance with our obligation to do so pursuant to Rule 8.3(a) of the *Rules of Professional Conduct* and Canon 3D(2) of the *Code of Judicial Conduct. See* Rule 8.3(a) ("A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."); *W.Va.Code of Jud. Conduct* Canon 3D(2) ("A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct should take appropriate action. A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority."). *See also Covington v. Smith,* 213 W.Va. 309, 582 S.E.2d 756 (2003) (referring a matter to the Office of Disciplinary

Counsel for further proceedings); *Gum v. Dudley*, 202 W.Va. 477, 491, 505 S.E.2d 391, 405 (1997) (same). Accordingly, we direct the Clerk of the Supreme Court of Appeals to transmit a certified copy of this Opinion to that tribunal.

## V.

### Conclusion

The circuit court erred in concluding that the attorneys employed by the appellants in the underlying action to defend Dr. Shaffer were subject to the duties imposed by the UTPA, and that the appellants could be held liable under the UTPA solely on account of the alleged litigation misconduct of those attorneys. On these conclusions the circuit court's order is reversed. We hold that defense attorneys employed by an insurance company to represent the interests of an insured in a liability matter are not directly subject to the provisions of the UTPA.

However, the circuit court correctly determined that an insurance company's duties under the UTPA are not delegable. An insurance company is responsible for its own actions under the UTPA, not those of a defense attorney employed to represent an insured. To the extent that the circuit court's order so holds, it is affirmed.

In sum, the appellants cannot be held directly liable under the UTPA for the litigation misconduct of the defense attorneys, but may be held liable for their own actions in knowingly encouraging, directing, participating, relying upon or ratifying that behavior.

Accordingly, the circuit court's September 12, 2002 order is affirmed, in part, reversed, in part, and the case is remanded for further proceedings not inconsistent with this opinion.

Affirmed in part, Reversed in part, and Remanded.

Justice DAVIS concurs and reserves the right to file a concurring opinion.

Chief Justice MAYNARD concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

DAVIS, J., concurring.

In this case the majority opinion has concluded that a defense attorney cannot be held liable under the Unfair Trade Practices Act for improper litigation conduct while defending an insured. The majority opinion has also concluded that an insurer maybe held vicariously liable, under the Act, for improper conduct by defense counsel, if the insurer has knowledge of the improper conduct and encourages, directs, participates in, relies upon or ratifies such conduct. I embrace both holdings by the majority opinion and therefore concur in the disposition of this case. I have chosen to write separately to more fully address the issue of vicarious liability of an insurer for improper conduct by defense counsel in defending an insured.

### Split of Authority

Courts around the country are split on the issue of holding an insurer vicariously liable for litigation misconduct by an insurer's attorney who is hired to defend an insured. The positions taken by jurisdictions addressing the issue are set out below.

### A. Insurer Not Vicariously Liable.

A *minority* of courts have held that an insurer may not be held vicariously liable for the litigation negligence or misconduct of defense counsel. *See Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 880-882, 110 Cal. Rptr. 511 (1973); *Marlin v. State Farm Mut. Auto. Ins. Co.*, 761 So.2d 380, 381 (Fla.Dist. Ct.App.2000); *Gibson v. Casto*, 233 Ga.App. 403, 504 S.E.2d 705, 708 (1998); *Brocato v. Prairie State Farmers Ins. Ass'n*, 166 Ill. App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200, 1203 (1998); *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 788 N.E.2d 522, 541 (2003); *Feliberty v. Damon*, 72 N.Y.2d 112, 531 N.Y.S.2d 778, 782, 527 N.E.2d 261 (1988); *Brown v. Lumbermens Mut. Cas. Co.*, 90 N.C.App. 464, 369 S.E.2d 367, 371 (1988); *Mentor Chiropractic Ctr., Inc. v. State Farm Fire & Cas. Co.*, 139 Ohio App.3d 407, 744 N.E.2d 207, 211 (2000); *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 628–29 (Tex.1998); *Evans v. Steinberg*, 40 Wash.App. 585, 699 P.2d 797, 798–799 (1985). *See also Mirville v. Allstate Indem. Co.*, 87 F.Supp.2d 1184, 1191 (D.Kan.

2000); *Ingersoll–Rand Equip. Corp. v. Transportation Ins. Co.*, 963 F.Supp. 452, 454–455 (M.D.Pa.1997). The leading case is *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 110 Cal.Rptr. 511 (1973).

In *Merritt* the plaintiff filed an action against the defendant as a result of injuries he received in an automobile accident with the defendant. The defendant's insurer retained counsel to represent the defendant. The case went to trial and the jury returned a verdict against the insured for four times the applicable policy limit. The insured subsequently assigned to the plaintiff his claim against the insurer for failure to settle within the policy limits.

As a result of the assignment, the plaintiff instituted a bad faith claim against the insurer. One of the theories alleged in the bad faith complaint was a claim for negligent conduct in defending the underlying case against the insured. This claim asserted that defense counsel was negligent in investigating the case, preparing for trial, and in conducting the trial. On a motion by the insurer, the trial court dismissed the claim that imputed liability on the insurer for conduct by defense counsel in the underlying action. The bad faith claim went to trial. The jury returned a verdict for the plaintiff. The insurer appealed the verdict. The plaintiff filed a cross-assignment of error on the trial court's dismissal of his vicarious liability claim against the insurer.

As to the defendant's appeal, the appellate court reversed the judgment against the defendant and remanded the case for the trial court to enter a judgment in favor of the insurer. In addressing the plaintiff's cross-assignment of error, on the issue of holding the insurer vicariously liable for defense counsel misconduct, the opinion rejected such a cause of action as follows:

The second charge in [the complaint] is negligent handling and conduct of the defense in the [underlying] case.... The charge, however, was directed against [the insurer] and not against the independent trial counsel who conducted and handled the defense of the lawsuit. Plaintiff's theory on this aspect of the case is that trial counsel acted as agents for their employer, [the insurer], and the employer may be held liable for the negligent conduct of its agents in defending the lawsuit.

We do not accept the claim that vicarious liability falls on one who retains independent trial counsel to conduct litigation on behalf of a third party when retained counsel have conducted the litigation negligently. In our view independent counsel retained to conduct litigation in the courts act in the capacity of independent contractors, responsible for the results of their conduct and not subject to the control and direction of their employer over the details and manner of their performance. By its very nature the duty assumed by [the insurer] to defend its [insured] against suits must necessarily be classified as a delegable duty, understood by all parties as such, for [the insurer] had no authority to perform that duty itself and, in fact, was prohibited from appearing in the California courts. Since [an insurer] is not authorized to practice law it must rely on independent counsel for the conduct of the litigation. We reject the suggestion that the [insurer] assumed by contract a nondelegable duty to present an adequate defense....

... Having chosen competent independent counsel to represent the insured in litigation, the [insurer] may rely upon trial counsel to conduct the litigation, and the carrier does not become liable for trial counsel's legal malpractice. If trial counsel negligently conducts the litigation, the remedy for this negligence is found in an action against counsel for malpractice and not in a suit against counsel's employer to impose vicarious liability.

... The conduct of the actual litigation, including the amount and extent of discovery, the interrogation, evaluation, and selection of witnesses, the employment of experts, and the presentation of the defense in court, remains the responsibility of trial counsel, and this is true both on plaintiff's side and on defendant's side of the case.

In our view the trial court correctly concluded that the negligence count ... did not set forth any breach of duty by

[the insurer] of the obligations with which it was chargeable. . . .

*Merritt,* 34 Cal.App.3d at 880–882, 110 Cal. Rptr. 511 (internal citations omitted).

### B. Insurer May Be Vicariously Liable.

A *majority* of courts have held that an insurer can be held liable for the misconduct of defense counsel during the defense of an insured. *See Continental Ins. Co. v. Bayless and Roberts, Inc.,* 608 P.2d 281 (Alaska 1980); *Lloyd v. State Farm Mut. Auto. Ins. Co.,* 176 Ariz. 247, 860 P.2d 1300 (1992); *Delmonte v. State Farm Fire and Cas. Co.,* 90 Hawai'i 39, 975 P.2d 1159 (1999); *United Farm Bureau Mut. Ins. Co. v. Groen,* 486 N.E.2d 571 (Ind.Ct.App.1985); *Anderson v. Southern Surety Co.,* 107 Kan. 375, 191 P. 583 (1920); *Safeco Ins Co v. Ellinghouse,* 223 Mont. 239, 725 P.2d 217 (1986); *Stumpf v. Continental Cas. Co.,* 102 Or.App. 302, 794 P.2d 1228 (1990); *Givens v. Mullikin ex rel. Estate of McElwaney,* 75 S.W.3d 383 (Tenn. 2002); *Majorowicz v. Allied Mut. Ins. Co.,* 212 Wis.2d 513, 569 N.W.2d 472 (1997). *See also Boyd Bros. Transp. Co. v. Fireman's Fund Ins. Cos.,* 729 F.2d 1407 (11th Cir. 1984); *National Farmers Union Property & Cas. Co. v. O'Daniel,* 329 F.2d 60 (9th Cir. 1964); *Smoot v. State Farm Mutual Auto. Ins. Co.,* 299 F.2d 525 (5th Cir.1962); *Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co.,* 240 F. 573 (1st Cir. 1917); *Pacific Employers Ins. Co. v. PB Hoidale Co.,* 789 F.Supp. 1117 (D.Kan.1992); *Hodges v. State Farm Mut. Auto. Ins. Co.,* 488 F.Supp. 1057 (D.S.C.1980). However, these jurisdictions are not uniform as to the requisite showing that must be made to hold an insurer vicariously liable. That is, most of the jurisdictions do not require that the insurer have actual knowledge of the misconduct of defense counsel. In those jurisdictions, actual knowledge is imputed. A few jurisdictions do not impute knowledge to the insurer. These jurisdictions require establishing that the insurer had knowledge of the misconduct.

**1. Imputed knowledge jurisdictions.** A majority of courts recognizing a cause of action against an insurer for defense counsel's misconduct, *do not* require actual knowl-

edge of the misconduct by the insurer. *See Continental Ins. Co. v. Bayless and Roberts, Inc.,* 608 P.2d 281, 294 (Alaska 1980); *Lloyd v. State Farm Mut. Auto. Ins. Co.,* 176 Ariz. 247, 860 P.2d 1300, 1303–1304 (1992); *United Farm Bureau Mut. Ins. Co. v. Groen,* 486 N.E.2d 571, 573–574 (Ind.Ct.App.1985); *Anderson v. Southern Surety Co.,* 107 Kan. 375, 191 P. 583, 584 (1920); *Safeco Ins. Co. v. Ellinghouse,* 223 Mont. 239, 725 P.2d 217, 225 (1986); *Stumpf v. Continental Cas. Co.,* 102 Or.App. 302, 794 P.2d 1228, 1232 (1990); *Majorowicz v. Allied Mut. Ins. Co.,* 212 Wis.2d 513, 569 N.W.2d 472, 477 (1997). *See also Boyd Bros. Transp. Co. v. Fireman's Fund Ins. Cos.,* 729 F.2d 1407, 1410–11 (11th Cir.1984); *National Farmers Union Property & Cas. Co. v. O'Daniel,* 329 F.2d 60, 65 (9th Cir.1964); *Smoot v. State Farm Mutual Auto. Ins. Co.,* 299 F.2d 525, 530 (5th Cir. 1962); *Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co.,* 240 F. 573, 581 (1st Cir.1917); *Pacific Employers Ins. Co. v. PB Hoidale Co.,* 789 F.Supp. 1117, 1122–23 (D.Kan.1992); *Hodges v. State Farm Mut. Auto. Ins. Co.,* 488 F.Supp. 1057, 1065 (D.S.C.1980). Although the decision in *United Farm Bureau Mut. Ins. Co. v. Groen,* 486 N.E.2d 571 (Ind.Ct.App.1985) involved conduct of an attorney retained by an insurer to represent a plaintiff, this case best illustrates the position of the imputed knowledge jurisdictions.

In *United Farm Bureau* the insurer provided automobile insurance coverage for its insured. After the insured was in an accident with a third-party, the insurer retained an attorney to represent the insured to collect on a claim arising from the accident. The attorney filed an action in the name of the insured against the tortfeasor. A default judgment was entered against the tortfeasor, though he was apparently never served with a copy of the complaint. The attorney forwarded a copy of the default judgment to the Bureau of Motor Vehicles, which, in turn, suspended the tortfeasor's driver's license. The tortfeasor was subsequently arrested for driving on a suspended license.

After his arrest, the tortfeasor challenged

the default judgment and it was set aside.[1] The tortfeasor then filed an action against the insurer for the negligent conduct of the attorney in not properly serving the complaint on him before seeking a default judgment.[2] The insurer moved for summary judgment on the grounds that it could not be vicariously liable for the actions of the attorney, who was an independent contractor representing the insured. The trial court denied the motion. The insurer filed an interlocutory appeal. The appellate court affirmed the trial court's decision and reasoned as follows:

> An attorney representing a client is not a party to the litigation, he acts on behalf of and in the name of the client. The attorney is the agent of the party employing him, and in court stands in his stead. The attorney has by virtue of the retainer or employment alone, the general implied authority to do on behalf of the client all acts in or out of court necessary or incidental to the prosecution or management of the suit or defense or the accomplishment of the purpose for which he was retained. Indiana courts have held that in the absence of fraud by the attorney the client is bound by the action of his attorney even though the attorney is guilty of gross negligence. The negligence of an attorney is the negligence of his client.
>
> ... Because of the close identity of an attorney with the client he represents, we hold that neither the absence of a master-servant relationship nor the characterization of the attorney as an independent contractor is a bar to liability of the [insurer] for the torts of the attorney acting within the scope of his authority.

*United Farm Bureau Mut. Ins. Co.,* 486 N.E.2d at 573–574 (internal citations omitted).

**2. Jurisdictions requiring insurer have actual knowledge.** A minority of courts that permit a cause of action against an insurer for defense counsel's misconduct require actual knowledge of the misconduct by the insurer. *See Delmonte v. State Farm Fire and Cas. Co.,* 90 Hawai'i 39, 975 P.2d 1159, 1175 (1999); *Givens v. Mullikin ex rel. Estate of McElwaney,* 75 S.W.3d 383, 393–396 (Tenn.2002). The decision in *Givens* fully addressed the issue of the requirement of actual knowledge.

In *Givens,* the plaintiff sued the defendant for injuries received in an automobile accident. The defendant's insurer provided counsel for him. After a period of discovery in the case, the insurer fired defense counsel and retained another attorney to represent the defendant. When new defense counsel entered the case it initiated another round of discovery. This new discovery by defense counsel included 237 interrogatories and subparts, that sought much of the information the defense already possessed. As a result of this discovery misconduct by defense counsel, the plaintiff filed a separate action against the insurer for the oppressive discovery conduct of defense counsel.[3]

The insurer filed a motion to dismiss the second complaint on the grounds that it could not be held vicariously liable for the actions of defense counsel. The trial court denied the motion to dismiss. The insurer thereafter filed an interlocutory appeal to the court of appeals. The court of appeals affirmed the trial court's ruling on vicarious liability. The insurer filed an appeal with the state supreme court. The high court affirmed the ruling on vicarious liability using the following reasoning:

> In the typical situation in which an insurer hires an attorney to defend an insured, the relationship of the insurer and its attorney is precisely that of principal to independent contractor. For example, the attorney is engaged in the distinct occupation of practicing law, and this occupation is one in which the attorney possesses special skill and expertise. Moreover, the attorney generally supplies his or her place of work and tools; the attorney is employed and paid only for the cases of indi-

---

1. The criminal charges were subsequently dismissed as well.

2. The original plaintiff in the underlying case and the attorney were also named as defendants.

3. The new action was also filed against the insured. This issue is not relevant to our discussion. Additionally, the plaintiff alleged other theories of liability that are not relevant.

vidual insureds; and he or she alone, consistent with ethical obligations to ensure competence and diligence in the representation, determines the time to be devoted to each case. Finally, and obviously, the practice of law is not, nor could it be, part of the regular business of an insurer.

Moreover, an insurer in Tennessee clearly possesses no right to control the methods or means chosen by an attorney to defend the insured. As we stated in *In re Youngblood*, 895 S.W.2d 322, 328 (Tenn. 1995), the insurer "cannot control the details of the attorney's performance, dictate the strategy or tactics employed, or limit the attorney's professional discretion with regard to the representation [of the insured]." In addition, we also affirmed without reservation that "[a]ny policy, arrangement or device which effectively limits, by design or operation, the attorney's professional judgment on behalf of or loyalty to the client is prohibited by the Code, and, undoubtedly, would not be consistent with public policy." *Youngblood*, 895 S.W.2d at 328. Therefore, because the insurer lacks this important right of control, an attorney hired by an insurer to defend an insured must be considered, at least initially, to enjoy the status of an independent contractor.

However, while the rule is that a principal is not generally liable for the tortious actions of an independent contractor, this rule is subject to many exceptions, and our finding that an attorney in this context should generally be regarded as an independent contractor does not, ipso facto, relieve the insurer of all liability from the attorney's acts or omissions. Chief among the some twenty-four exceptions to this general rule listed in the Restatement (Second) of Torts is that contained in section 410, which provides that when an independent contractor acts pursuant to the orders or directions of the employer, then the employer "is subject to the same liability . . . as though the act or omission were that of the employer himself.". . .

. . . .

Consequently, although an insurer clearly lacks the right to control an attorney retained to defend an insured, we simply cannot ignore the practical reality that the insurer may seek to exercise actual control over its retained attorneys in this context. While this practical reality raises significant potential for conflicts of interest, it does not become invidious until the attempted control seeks, either directly or indirectly, to affect the attorney's independent professional judgment, to interfere with the attorney's unqualified duty of loyalty to the insured, or to present "a reasonable possibility of advancing an interest that would differ from that of the insured." To be clear, our recognition of the control exercised by insurers in this context does not condone this practice, especially when it works to favor the interests of the insurer over that of the insured; rather, we acknowledge this aspect of the relationship only because it would be imprudent for this Court to hold that attorneys are independent contractors vis-a-vis insurers, but then to ignore the practical realities of that relationship when it causes injury.

Accordingly, we hold that an insurer can be held vicariously liable for the acts or omissions of an attorney hired to represent an insured when those acts or omissions were directed, commanded, or knowingly authorized by the insurer. This having been said, we suspect that cases in which an insurer may be held liable under an agency theory will be rare indeed. We do not hold today that an insurer may be held vicariously liable for the acts or omissions of its hired attorney based merely upon the existence of the employment relationship alone. Nor do we hold that an insurer may be held liable for any acts or omissions resulting solely from the exercise of that attorney's independent professional judgment, and in all cases, a plaintiff must show that the attorney's tortious actions were taken partly at the insurer's direction or with its knowing authorization. Nevertheless, when the insurer does undertake to exercise actual control over the actions of the insured's attorney, then it may be held vicariously liable for any harm to a plaintiff proximately caused thereby. *Givens*, 75 S.W.3d at 393–396 (internal citations omitted).

### C. The Position Adopted by this Court.

I have presented the different ways in which courts address the issue of vicarious liability of an insurer for defense counsel's misconduct, because I believe it is critical that the bench and bar understand the limitations of the majority opinion in this case. The majority opinion does not recognize a cause of action under the Act when an insurer does not have actual knowledge of defense counsel's misconduct. That is, the majority opinion is squarely in line with the position articulated in *Givens*. To be held accountable under the Act for defense counsel's misconduct during litigation, an insurer must "knowingly" encourage, direct, participate in, rely upon, or ratify litigation misconduct by defense counsel. There is no room in the majority opinion for a cause of action based upon "should have known or could have known" allegations. A plaintiff must show the insurer had actual knowledge of the complained of misconduct.

Based upon the foregoing, I concur in the majority opinion.

Chief Justice MAYNARD, concurring, in part, and dissenting, in part.

In *Barefield*, I concur with the majority's holding that an insurer cannot be held liable under the West Virginia Unfair Trade Practices Act for the actions of a defense attorney when the attorney's strategy and tactics are a result of his or her independent, professional discretion. However, I dissent to the holding that the conduct of an insurer during the pendency of a lawsuit may support a cause of action under the Act.

Similarly, in *Rose*, I concur with reversing the circuit court's order to the extent that it ruled that a defense attorney, hired by an insurance company to defend the interests of an insured in a liability matter, is subject to the provisions of the Unfair Trade Practices Act. However, I dissent to affirming the circuit court's ruling that an insurance company can be held liable, under certain circumstances, for violations of the Act by a defense attorney employed by the insurance company to defend an insured.

Both *Barefield* and *Rose* are third-party statutory bad faith cases. As I previously made clear, I do not believe that a private cause of action, and especially a third-party cause of action, should exist under the Unfair Trade Practices Act. The Act itself does not expressly indicate that it supports a private cause of action. Rather, this Court, many years before any of its present members arrived, in a perfect example of judicial legislation, created such a cause of action from whole cloth. *See Jenkins v. J.C. Penney Cas. Ins. Co.*, 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds by State ex rel. State Farm Fire & Cas. Co. v. Madden*, 192 W.Va. 155, 451 S.E.2d 721 (1994). As I stated in footnote 10 of *State ex rel. Medical Assurance v. Recht*, 213 W.Va. 457, 469, 583 S.E.2d 80, 92 (2003), among the small minority of states that recognize a private cause of action arising from their unfair claim settlement statutes,

> only a handful recognize *third-party* bad faith claims[.] According to [*State ex rel. Allstate Ins. Co. v.] Gaughan*, 203 W.Va. 358, 369, n. 15, 508 S.E.2d [75], 86 [1998], "[m]ost courts which have considered a third-party bad faith action have not allowed such a third-party claim against a tortfeasor's insurer." (Citation omitted). This is in accord with Paul R. Rice, *A Quasi–Attorney–Client Privilege? West Virginia's Mislabeled Fiduciary Duty Exception*, 101 W.Va. L.Rev. 311, 314 (1998) which says, "[b]ecause the third-party action involves a plaintiff to whom the insurance company did not owe a contractual duty under the insurance policy, most state jurisdictions that have addressed the issue have refused to find an implied statutory duty under legislative schemes similar to those in West Virginia." (Footnote omitted).

Because I do not believe that this Court should have created third-party statutory bad faith claims, I disagree with the expansion of such a cause of action by the majority in the instant cases.

The fact is that third-party bad faith claims, besides being wholly unsupported in statutory law, simply are a bad idea. First, they are unnecessary. Insurers already

have a contractual and implied duty of good faith and fair dealing to their insureds to settle claims against the insureds. In Syllabus Point 2 of *Shamblin v. Nationwide Mut. Ins. Co.*, 183 W.Va. 585, 396 S.E.2d 766 (1990), this Court held:

> Wherever there is a failure on the part of an insurer to settle within policy limits where there exists the opportunity to settle and where such settlement within policy limits would release the insured from any and all personal liability, the insurer has prima facie failed to act in its insured's best interest and such failure to so settle prima facie constitutes bad faith toward its insured.

Thus, when an insurer refuses to settle with a third-party claimant and, as a result, the claimant is awarded a verdict in a personal injury trial against the insured in excess of the insured's policy limits, the insurer is prima facie guilty of bad faith toward its insured. At that point,

> It will be the insurer's burden to prove by clear and convincing evidence that it attempted in good faith to negotiate a settlement, that any failure to enter into a settlement where the opportunity to do so existed was based on reasonable and substantial grounds, and that it accorded the interests and rights of the insured at least as great a respect as its own.

Syllabus Point 3, *Shamblin, supra.* Accordingly, insurers have a powerful incentive to settle claims of third-party claimants absent the bringing of third-party bad faith actions.

Second, third-party bad faith claims create potentially conflicting duties of insurers toward both third-party claimants and their own insureds, to the detriment of those insureds. As noted above, insurers have both a contractual duty and an implied duty of good faith and fair dealing to their insureds. In contrast, the relationship between an insurer and a third-party claimant is adversarial. "[T]hat the insurer is the representative of the insured logically imports that the third party tort claimant's status as the adversary of the insured renders him, ipso facto, the adversary of the insured's agent." *Linscott v. State Farm Mutual Auto. Ins. Co.*, 368

A.2d 1161, 1163–64 (Me.1977). "[T]he insurer stands in the shoes of the insured in dealing with the victim." *Long v. McAllister*, 319 N.W.2d 256, 262 (Iowa 1982). Nevertheless, in recognizing third-party bad faith claims, this Court illogically mandates that an insurer owes competing duties to both insureds and third-party claimants. However, "[n]o servant can serve two masters." [1]

The problem of competing duties is greatly exacerbated by the majority's decisions in the instant cases. If an insurer, as we have seen, is an adversary of a third-party claimant in the settlement process, it is even more of an adversary once litigation is instituted against its insured. Yet, the majority says that insurers now are potentially liable to third-party claimants for every decision they make in the course of defending their insureds, and they may be liable for the actions of the attorneys they hired to represent the insureds. While the majority attempts to distinguish the actions of insurers from the actions of defense attorneys, acting independently, such a distinction in practice is a chimera—a vain and idle fancy. Now third-party claimants simply will allege in their complaints wrongful failure to settle both pre—and post-litigation. Claimants will further aver that the insured's defense attorney was not acting independently of the insurer, but that the insurer "breached its duties under the Act by knowingly encouraging, directing, participating in, relying upon, or ratifying wrongful litigation conduct of a defense attorney hired by the insurance company to represent an insured." Syllabus Point 6, *Rose.* Consequently, all litigation decisions made by the insurer and the insured's defense attorney will be open to the scrutiny of the courts. Such a result is appalling in a justice system such as ours where every party is due zealous representation. Our system is an adversary system. Such systems, when they are allowed to work properly, are great mechanisms to find the truth and ensure fair trials. But when one adversary party is punished simply for being adversarial, the system breaks down and degenerates into an unfair and biased exercise in bullying. It is about as fair as a boxing match where one boxer has a hand tied behind his back.

---

1. Luke 16:13.

Other courts have recognized the problems that arise when post-litigation conduct is made the subject of bad faith claims against insurers.

Allowing litigation conduct to serve as evidence of bad faith would undermine an insurer's right to contest questionable claims and to defend itself against such claims. As a district court in this Circuit aptly noted, permitting allegations of litigation misconduct would have a "chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law." *International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.*, 850 F.Supp. 1509, 1529 (D.Wyo. 1994), *aff'd*, 52 F.3d 901 (10th Cir.1995). Insurers' counsel would be placed in an untenable position if legitimate litigation conduct could be used as evidence of bad faith. Where improper litigation conduct is at issue, generally the Federal Rules of Civil Procedure provide adequate means of redress, such as motions to strike, compel discovery, secure protective orders, or impose sanctions. *See id.* at 1528–29.

*Timberlake Const. Co. v. U.S. Fidelity and Guar. Co.*, 71 F.3d 335, 341 (10th Cir.1995). *See also Federated Mut. Ins. Co. v. Anderson*, 297 Mont. 33, 42, 991 P.2d 915, 922 (1999) ("Public policy favors the exclusion of [an insurer's postfiling conduct] under normal circumstances because it can hinder the right to defend and can impair access to the courts; therefore, courts must use extreme caution in deciding to admit such evidence even if relevant."(Citation omitted.)); *Howard v. State Farm Mut. Auto. Ins. Co.*, 316 S.C. 445, 448, 450 S.E.2d 582, 584 (1994) ("Evidence that arises after the denial of the claim is not relevant to the propriety of the conduct of the insurer at the time of its refusal." (Citation omitted.)).

In sum, the majority's holdings that post-litigation conduct of an insurer may support a cause of action under the Unfair Trade Practices Act and that an insurer is potentially liable for the actions of a defense attorney it hired to represent the insured are devoid of common sense. They infringe on the constitutional right of access to the courts of insurers and insureds by seriously compromising their ability to defend themselves in actions brought by third-party claimants. Actually, I believe we have so crippled and hobbled insureds in these cases that their constitutional right of access to the courts has been denied. In effect, the de facto rule now is that parties in litigation, *with the exception of insurers and insureds,* have a right to zealous representation.

Also, the majority opinions are blatantly anti-consumer (insurance consumer) in that they decrease the value of insurance policies by reducing the contractual duty of insurers to defend their insureds in litigation. Any challenge by an insured to the representation of his insurer-provided lawyer can now be answered with the claim that the insurer had an equal duty to the insured's adversary, the third-party claimant. Finally, by increasing frivolous third-party bad faith litigation and concomitantly the cost of litigation to insurance companies, the majority opinion will have the effect of increasing the cost of purchasing insurance for all West Virginia consumers. That means premiums will increase, and premiums are paid *only* by consumers.

For all of these reasons, I respectfully dissent to the majority's holdings that post-litigation conduct of an insurer may support a statutory bad faith action, and that an insurer may be liable for the actions of a defense attorney hired by the insurance company to represent its insured.